**NORTHWAY LANES, a co-partnership, and Marshull, Inc., a Michigan corporation, Plaintiffs,**

v.

**HACKLEY UNION NATIONAL BANK AND TRUST COMPANY, a National banking corporation, Defendant.**

**No. CA 6072.**

United States District Court,
W. D. Michigan, S. D.

July 7, 1971.

724

Arthur M. Rude, Muskegon, Mich., for Northway Lanes.

H. Winston Hathaway, Muskegon, Mich., for Hackley Bank.

John Milanowski, U. S. Atty., William D. Ruckelshaus, Asst. Atty. Gen., and C. Westbrook Murphy, Office of Comptroller of Currency, Washington, D. C., amicus curiae.

## OPINION

ENGEL, District Judge.

### FINDINGS OF FACT

This action was instituted by Northway Lanes, a co-partnership consisting of Ralph G. Kuris and Bessie Shull, and Marshull, Inc., a Michigan Corporation, as plaintiffs, against the Hackley Union National Bank and Trust Company, a National Banking Association, under the provisions of Sections 85 and 86, Title 12, United States Code. Plaintiffs sue to recover the sum of $113,333.24, being double the amount of alleged usurious interest paid by them to defendant, basing their right thereto upon the provisions of 12 U.S.C. § 86 which provides:

§ 86. Usurious interest; penalty for taking; limitations

The taking, receiving, reserving, or charging a rate of interest greater than is allowed by the preceding section, when knowingly done, shall be deemed a forfeiture of the entire interest which the note, bill, or other evidence of debt carries with it, or which has been agreed to be paid thereon. In case the greater rate of interest has been paid, the person by whom it has been paid, or his legal representatives, may recover back, in an action in the nature of an action of debt, twice the amount of the interest thus paid from the association taking or receiving the same: *Provided*, That such action is commenced within two years from the time the usurious transaction occurred. R.S. § 5198.

On November 10, 1967, defendant, a National Banking Association, loaned to plaintiff co-partnership $600,000.00, evidenced by a so-called mortgage note in the face amount of $350,000.00 and a so-called installment note in the face amount of $337,500.00, of which latter amount $87,500.00 was interest reserved by the Bank in advance.

The mortgage note was payable in monthly installments of $5,283.00, with such payments to be applied first on

interest, at the rate of 7% per annum on the unpaid balance, and the balance on principal. This note also reserved the privilege of prepayment in the maker, subject to payment of a prepayment charge of 5% if prepaid during the year 1968. Provision also was made for payment of a late charge not to exceed 4% on any delinquent installment.

The installment note was payable in 40 monthly installments of $8,437.50 each, commencing November 20, 1967, and continuing on the same day of each month except May, June, July and August of each year. There was no specific provision in the note for the application of a portion of any payment upon interest. This note contained similar provisions regarding prepayment and late charges.

Both notes contained the recitation that they were secured by a real estate mortgage and security agreement of even date therewith. The notes were, in fact, secured by the same real estate mortgage and security agreement, and therefore, by the same collateral.

At the time the loans were made, the defendant Bank remitted $600,000.00 to plaintiff co-partnership. The plaintiff in turn deposited money with defendant in escrow upon which defendant drew its cashier's checks, showing the plaintiff co-partnership as remitter, in payment to various creditors of the partnership and also to others for total closing charges of $1,595.00.

On February 27, 1968, the partners comprising plaintiff co-partnership filed articles of incorporation for plaintiff corporation, Marshull, Inc., with the State of Michigan, with the partners as officers and sole stockholders. The corporation was formed to assume the ownership and operation of the bowling alley business previously operated by the partnership, in order that the Bank loan could be refinanced by the corporation with another bank.

On March 1, 1968, the partnership conveyed the business real estate to the corporation by deed which contained the recital that the land was conveyed subject to the real estate mortgage to defendant Bank, which the plaintiff corporation assumed and agreed to pay. The personal property covered by the security agreement also was conveyed by the partnership to the corporation by bill of sale executed the same day.

During the period of the corporate formation and later conveyance of real and personal property by the partnership, the defendant was not notified nor did it have knowledge that incorporation and assumption of the partnership debts had occurred. Lacking knowledge of the existence of Marshull, Inc., no arrangement was made between Hackley Bank and Marshull, Inc., to relieve Mr. Kuris and Mrs. Shull individually from liability on the existing indebtedness.

Commencing March 1, 1968, the partnership ceased to function as a going business and the corporation, Marshull, Inc., became the operating entity for the bowling alley business previously owned and operated by the partnership.

The plaintiff partnership paid interest on the mortgage note prior to March 1, 1968, totaling $5,448.50, and made monthly payments on the installment note of $8,437.50 on November 10 and December 26, 1967, and January 26 and February 27, 1968, totalling $33,750.00.

The plaintiff corporation, subsequent to March 1, 1968, made payments directly to the defendant on the mortgage note including interest in the amount of $5,054.37 on or before payment in full on April 16, 1968. The corporation also made one monthly payment on the installment note on April 9, 1968, of $8,437.50. Both notes were paid off in full on April 16, 1968, when Muskegon Bank and Trust Company issued cashier's check No. 58202 in the amount of $592,073.04 to the order of Marshull, Inc. This check was endorsed restrictively by Mr. Kuris and Mr. Rude, as corporate officers, to the order of Northway Lanes, a co-partnership consisting of Ralph G. Kuris and Bessie Shull. The partners then endorsed the check to the order of Hackley Union National Bank and Trust Company. This final transaction satisfied the plain-

tiffs' entire indebtedness and discharged the outstanding mortgage and security agreement.

Included in the amount of the final payment made on April 16, 1968 by the plaintiffs was a prepayment charge of $30,000.00, $17,500 attributable to the so-called mortgage note and $12,500 to the so-called installment note.

Based on the foregoing facts, plaintiffs claim that the total charges which constitute usurious interest, for which they seek double damages under 12 U.S.C. § 86 are:

| | |
|---|---|
| Interest at 7% for 158 days | $25,071.62 |
| Prepayment charges | 30,000.00 |
| Title Insurance on mortgagee's interest only | 876.00 |
| Land survey | 125.00 |
| Bank's attorney fees | 575.00 |
| Recording new mortgage (2 counties) | 14.00 |
| Financing search | 3.00 |
| Security Instrument filing fee | 2.00 |
| Total | $56,666.62 |

Defendant claims that in its status as a National Banking Association, the above charges may lawfully be made by it without rendering the transaction usurious under the statute.

## CONCLUSIONS OF LAW

### A. HISTORY

In measuring the actions of a national banking association against the provisions of Sections 85 and 86, Title 12, United States Code, this court must carefully follow the directions given by the United States Supreme Court in 1873 when Mr. Justice Strong, speaking for a unanimous Court stated:

"In an action like the present, brought to recover that which is substantially a statutory penalty, the statute must receive a strict, that is, a literal construction. The defendant is not to be subjected to a penalty unless the words of the statute plainly impose it." Tiffany v. National Bank of Missouri, 85 U.S. (Wall.) 409, 410, 21 L.Ed. 862 (1873).

The history of the National Banking Act consistently shows an intent that in lending money to a borrower within a state, a national bank shall be in a position equal to the most favored position of a state institution in loaning money to a particular type of borrower. Tiffany v. National Bank of Missouri, supra.

The National Bank Act of 1864, 13 Stat. 99, substantially amended and replaced the National Currency Act of 1863, 12 Stat. 665. The paramount intention of both of these statutes was to ". . . give every possible support to the public credit . . . ." by a uniform currency ". . . . furnished by national associations, organized under a general act of Congress . . . ." Abraham Lincoln, Special Message on Financing the War, Senate Journal, pp. 121–122 (37th Cong., 3rd Sess., Jan. 17, 1863). Consistent with this intention Congress gave special competitive advantages to national banks over state banks in order to induce the state banks either to convert into national associations or go out of business altogether.

Section 30 of the National Bank Act— now found at 12 U.S.C. §§ 85 and 86— was contained in a bill introduced in the Senate by Senator Sherman following the defeat of a similar national bank bill in the House of Representatives [(Cong. Globe, 38th Cong., 1st Sess., pp. 1453, 1477 (1864)]. The interest rate provisions of Section 30 were written by the Senate Finance Committee and considered to be an important amendment to the National Currency Act of 1863. (*Id.* at 1865–66, 1871). This section as reported from committee provided that national banks could charge

"[t]he rate allowed by the laws of the State or territory where the bank is located, and no more; and when no rate is fixed by the laws of the State or Territory, the bank may take, receive, reserve, or charge a rate not exceeding seven percent."

(*Id.* at 1871).

Senator Sherman, who had a great deal to do with the drafting of the interest

rate section, explained the intention of the section as follows (*Id.* at 2126):

"I know that the amendment as agreed upon in the Committee on Finance was well and carefully considered, and was intended to confer on these national banks the same privileges that are conferred by the laws of the States on other associations and individuals, and therefore, to avoid the controversy, I will move to reconsider the vote on the amendment proposed by the Senator from Iowa, which was adopted, and let us have the original amendment stand just as it was reported from the committee, which I know was considered carefully, and which will allow those national banks the same rate of interest as is provided for by the local law *for the people within their own States.* If the States choose to change their law, they can change it at any time. My own preference, however, as I have already stated, is to establish a uniform rate of interest by our law; but having been overruled on that point, *I prefer now to place the national banks in each state on precisely the same footing with individuals and persons doing business in the State by its laws.*" (Emphasis added.)

In light of this legislative history and the subsequent cases which have culminated in 12 U.S.C. § 85, the Comptroller of the Currency published the following interpretation of Section 85 in Paragraph 7310 of the Comptroller's Manual for National Banks:

"A national bank may charge interest at the maximum rate permitted by state law to any competing state-chartered or licensed lending institution. If state law permits a higher interest rate on a specified class of loans, a national bank making such loans at such higher rate is subject only to the provisions of state law, relating to such class of loans that are material to the determination of the interest rate. For example, a national bank may lawfully charge the highest rate permitted to be charged by a state-licensed small loan company or morris plan bank, without being so licensed.

A national bank located in a state the law of which denies the defense of usury to a corporate borrower may charge a corporate borrower any rate of interest agreed upon by such borrower."

Defendant bank claims that, following the statute and interpretations above cited, it may lawfully make the challenged charges because they are authorized under Michigan and Federal law in certain circumstances.

## B. TAKING INTEREST IN ADVANCE

Defendant added $87,500 interest in advance to the $250,000 remitted on the installment loan. Plaintiffs claim that this is only permitted in Michigan law under Section 38 of the Industrial Loan Act, M.S.A. § 23.766. Plaintiffs contend this particular loan does not qualify because the loan exceeded the limitation upon lending to 3% of the bank's capital and surplus, and because the payments, which by the term of the note were abated during the summer months, were not uniform as specifically required by the Act. M.S.A. § 23.766 provided that:

§ 23.766 Industrial loan business; application, certificate of authority; powers.] Sec. 38. Any bank subject to the provisions of this chapter may apply to the commission, on such application form as may be prescribed by it, for permission to engage in the business of making industrial loans. In passing upon such applications, the commission shall consider the amount of capital and surplus of the bank, the character and needs of the community to be served, and such other facts and circumstances that seem to the said commission proper, and may grant or refuse the application in view of its findings. Any bank, upon receipt from the commission of a certificate of authority to operate an industrial loan department, notwithstanding any other

provision of law to the contrary, shall have power:

(a) To loan money and deduct interest therefor in advance at the rate of 7% per annum, or less, on the entire amount of the loan from the date of disbursement thereof to the date of maturity thereof or to the date of maturity of the last maturing installment thereof, and in addition to receive uniform weekly, semi-monthly or monthly repayment installments on said loan, herein called "industrial loans", with or without an allowance of interest on such installments. If necessary, the amount of the final installment may be less than the amount of any previous installment. No such loan shall exceed 3% of the capital and surplus of the bank, nor be made for a longer period than [36] months from the date thereof, and the aggregate principal amount of such loans at any time shall not exceed 25% of the total deposits of the bank or 2½ times the capital and surplus of the bank, whichever is the greater: Provided, That, upon proper showing and consistent with sound banking practice, the commission may waive said restrictions.

(b) To charge the borrower in connection with loans made pursuant to this section $1.00 for each $50.00 or fraction thereof for expenses, including any examination or investigation of the character and circumstances of the borrower, co-maker or surety and the drawing and taking acknowledgment of necessary papers. No charge shall be collected unless a loan shall have been made and no charge shall exceed $15.00.

(C.L. '48, § 487.38).

■ With respect to the 3% limitation under the statute, the court agrees with Mr. C. Westbrook Murphy, who appeared as amicus curiae on behalf of the United States Comptroller of Currency, that such limitations do not apply to national banking associations. Federal and not state law would govern questions of financial stability of national banks.

Whether or not, however, the defendant as a national banking association can be excused from the requirement of the Industrial Loan Act that payments be uniform is another matter. That requirement is an explicit limitation on the specified class of loan itself rather than on the status of the lender, and whatever may be its value otherwise, the court is of the opinion that it is an integral part of that statute. The Act also provides that a borrower should not be charged more than $15.00 in connection with expenses incurred in making the loan. This provision also constitutes an integral part of the statutory scheme. Therefore, if defendant bank's rights must hinge upon the Industrial Loan Act, it has not complied.

Title 12, Section 85 of the United States Code sets forth standards for the charging of interest by a national bank. The Act provides that:

§ 85. Rate of interest on loans, discounts and purchases

Any association may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidences of debt, interest at the rate allowed by the laws of the State, Territory, or District where the bank is located, or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, whichever may be the greater, and no more, except that where by the laws of any State a different rate is limited for banks organized under State laws, the rate so limited shall be allowed for associations organized or existing in any such State under this chapter. When no rate is fixed by the laws of the State, or Territory, or District, the bank may take, receive, reserve, or charge a rate not exceeding 7 per centum, or 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located,

whichever may be the greater, and such interest may be taken in advance, reckoning the days for which the note, bill, or other evidence of debt has to run. The maximum amount of interest or discount to be charged at a branch of an association located outside of the States of the United States and the District of Columbia shall be at the rate allowed by the laws of the country, territory, dependency, province, dominion, insular possession, or other political subdivision where the branch is located. And the purchase, discount, or sale of a bona fide bill of exchange, payable at another place than the place of such purchase, discount, or sale, at not more than the current rate of exchange for sight drafts in addition to the interest, shall not be considered as taking or receiving a greater rate of interest. R.S. § 5197; June 16, 1933, c. 89, § 25, 48 Stat. 191; Aug. 23, 1935, c. 614, § 314, 49 Stat. 711.

The rate of interest allowed in the State of Michigan is set forth at M.S.A. § 19.11 which provides:

§ 19.11] Legal interest rate; scope, limitation. *Section* 1. *The People of the State of Michigan enact,* That the interest of money shall be at the rate of five [5] dollars upon one hundred [100] dollars for a year, and at the same rate for a greater or less sum, and for a longer or shorter time, except that in all cases it shall be lawful for the parties to stipulate in writing for the payment of any rate of interest, not exceeding seven [7] per centum per annum: Provided, That this act shall not apply to the rate of interest on any note, bond or other evidence of indebtedness issued by any corporation, association, or person, the issue and rate of interest of which have been expressly authorized by the Michigan public utilities commission or the Michigan securities commission. (CL '48, § 438.51; CL '29, § 9239; CL '15, § 5997; CL '97, § 4856.)

Thus imposition of interest at 7% by a national banking association located in Michigan is permissible.

The question then becomes whether in construing a National Banking Association's powers to fix interest at 7%, one must take into account the state law interpretation as to what is commonly known as "add-on" or discounted rates of interest. Except where specifically provided by the Industrial Loan Act, the State of Michigan did not permit this to its state banking institutions.

This issue was faced in Evans v. National bank of Savannah, 251 U.S. 108, 40 S.Ct. 58, 64 L.Ed. 171 (1919). In that case a national bank made a loan to the petitioner at the maximum legal rate of interest and had taken the interest in advance. Georgia state courts had previously held that a state bank loan under similar circumstances constituted usury. The issue before the Court thus became whether the Georgia rule would apply to a transaction in which the lender was a national bank. In construing the federal statute, from which section 85 was derived, the Court held that the provisions of the federal act controlled. The Court in so holding stated in *Evans,* supra, at 113–114, 40 S.Ct. at 59–60 the rationale for its decision:

"In Fleckner v. United States Bank, 8 Wheat. 338, 349, 354, 5 L.Ed. 631, the charter of the Bank of the United States inhibited it from taking interest 'more than at the rate of six per centum' and plaintiff claimed that by deducting interest at the rate of six per centum from the amount of a discounted note, the bank received usury. Replying to that point, this court, through Mr. Justice Story, said: 'If a transaction of this sort is to be deemed usurious, the same principle must apply with equal force to bank discounts, generally, for the practice is believed to be universal; and, probably, few, if any, charters, contain an express provision, authorizing, in terms, the deduction of the interest in advance upon making loans or discounts. It has always been supposed, that an authority to discount, or make discounts, did, from the very force of the terms, necessarily include an au-

thority to take the interest in advance. And this is not only the settled opinion among professional and commercial men, but stands approved by the soundest principles of legal construction. Indeed, we do not know in what other sense the word discount is to be interpreted. Even in England, where no statute authorizes bankers to make discounts, it has been solemnly adjudged, that the taking of interest in advance by bankers, upon loans, in the ordinary course of business, is not usurious.' See also McCarthy v. First National Bank, 223 U.S. 493, 499 [32 S.Ct. 240, 56 L.Ed. 523]. * * *

Associations organized under the National Bank Act are plainly empowered to discount promissory notes in the ordinary course of business. To discount, *ex vi termini*, implies reservation of interest in advance; and, under the ancient and commonly accepted doctrine, when dealing with short-time paper such a reservation at the highest interest rate allowed by law is not usurious. Recognizing prevailing practice in business and the above stated doctrine concerning usury, we think Congress. intended to endow national banks with the power, which banks generally exercise, of discounting notes reserving charges at the highest rate permitted for interest. To carry out this purpose, the National Bank Act provides that associations organized under it may reserve on any discount interest at the rate allowed by the State; and only when there is reservation at a rate greater than the one specified does the transaction become usurious.

The maximum interest rate allowed by the Georgia statute is eight per centum. That marks the limit which a national bank there located may charge upon discounts; but its right to retain so much arises from federal law. The latter also completely defines what constitutes the taking of usury by a national bank, referring to the state law only to determine the maximum permitted rate."

Although this case is old, it still appears to be the law and has been untouched since it was decided by the United States Supreme Court in 1919. Therefore, it was in any event, irrespective of state law, proper for the defendant bank to have reserved interest in advance as done here.

### C. CLOSING CHARGES

Plaintiffs claim that the $1,595 charges in connection with closing the loan are those which were properly the charges of the lender and that under Michigan law the imposition of the burden of those charges upon the borrower is tantamount to usury. With reference to the reasonableness of those charges, after hearing the evidence at the trial, the court is of the opinion that such charges were reasonable and necessary in connection with a transaction of this nature. It is true, however, that if a national banking association is to be held solely to the standard of a state bank (other than a savings and loan association), such add-on's would be usury, see Panos v. Smith, 116 F.2d 445 (6th Cir. 1940); Schumacher v. Lawrence, 108 F.2d 576 (6th Cir. 1940) and Michigan cases cited therein.

In response, defendant claims first that it did not charge plaintiffs with these expenses, but rather that plaintiffs themselves, through the escrow account, directly and voluntarily paid the expenses to the persons who were owed them. The court is unimpressed with this view. The charges were in fact those normally incurred by the lender and not the borrower. The expense was in fact borne by the borrower and in the court's opinion the particular method employed to transmit payment is immaterial. If defendant bank could lawfully pass the charge on to the borrower, it makes no difference. If it could not lawfully pass the charge on to the borrower, such illegality would not be cured by the method employed.

Defendant bank, however, claims that in any event such charges, though not permitted by a state bank, are at the

same time permitted by savings and loan associations organized under state law, M.S.A. § 23.540(101) et seq., and that, therefore, it is entitled to the same benefits. M.S.A. § 23.540(379) provides:

§ 23.540(379) Payment of charges in connection with loans; statement of charges.] Sec. 379. (1) Every association [and every federal savings and loan association, except as federal laws or regulations provide otherwise,] may require borrowing members to pay all reasonable and necessary charges incurred in connection with the making, closing, disbursing, extending, readjusting, or renewing of real estate loans[, property improvement loans and educational loans].

(2) The charges authorized by this section shall be in addition to interest authorized by law, and shall not be deemed to be a part of the interest collected or agreed to be paid on such loans within the meaning of any law of this state which limits the rate of interest which may be exacted in any transaction.

(3) The association shall furnish a loan settlement statement to each borrower upon the closing of the loan, indicating in detail the charges the borrower has paid or obligated himself to pay the association or to any other person in connection with the loan. A copy of the statement shall be retained in the records of the association.

(CL '48, § 489.779.)

While originally savings and loan associations were limited to investment in residential property, the "Savings and loan association act of 1964", M.S.A. § 23.540(101) et seq., has removed this limitation. § 23.540(112) defines "Association" as a "savings and loan association or savings association heretofore or hereafter organized and chartered pursuant to the provisions of this act for the purpose of accumulating and acquiring funds of the public and investing such funds pursuant to the provisions of this act." § 23.540(369), an amendment to the above act which became effective on June 21, 1967 states:

"An association may make or purchase real estate loans and land contracts secured by real property. No such real estate loans and land contracts shall be originated or purchased in excess of 80% of appraised valuation, except as provided in sections 369c, 369d, 369e, 370 and 370c."

These two sections should be contrasted with their predecessors. Thus, former § 23.541 said:

"A building and loan association, or savings and loan association, as contemplated by this act, is any association or corporation . . . . organized or incorporated under this act for the purpose of acquiring, building and improving homesteads, removing encumbrances therefrom, accumulating money to be loaned to its members . . . . . [etc.]"

M.S.A. § 23.540(369) was one of two sections which repealed section 354 of the "Savings and loan act of 1964". That section had read:

"An association may make real estate loans secured by home property subject to the following limitations:

(a) No such loan shall exceed $50,000.

(b) No home property securing such a loan shall be situated beyond the lending area."

Thus, it is now clear that savings and loan associations are not limited to loans on residential property or improvements and can, in reality, compete with banks for the financing of commercial property. [Note that the above amendment went into effect on June 21, 1967 and that the loan in question was made on November 10, 1967.]

As pointed out earlier, a national bank is permitted to charge the highest rate charged by a state licensed small loan company or Morris plan bank without being so licensed. There seems no logical reason why it may not also lawfully charge the highest rate permitted to be charged by state licensed savings and loan associations.

■ Since a savings and loan association can in fact charge 7% interest and in addition thereto, under M.S.A. § 23.-540(379), require a borrower to pay all reasonable and necessary charges incurred in connection with the making, closing and disbursing of real estate loans, it is the opinion of the court that a national banking association operating within the State of Michigan may do so also. To construe the Act otherwise would place a national bank in a competitively inferior position not contemplated by the federal statute.

### D. PREPAYMENT CHARGE

Finally, plaintiffs claim that the $30,-000 charge made by defendant and paid by plaintiffs as a condition of prepayment of the loans is unlawful and constitutes usury.

Plaintiffs have shown the court no Michigan statute or case law so holding. The burden was upon them so to prove, particularly in the light of *Tiffany*, supra.

■ Since, absent agreement to the contrary, the lender has a right to refuse prepayment altogether and to insist that a note and interest be paid according to its terms, imposition of a reasonable prepayment charge does not seem harsh. The court cannot find that a 5% prepayment charge is unconscionable or even unreasonable under the circumstances here. Plaintiffs could in any event have avoided the charge by simply continuing to pay the notes according to their terms. By accepting prepayment, the bank relinquished its right to receive anticipated earnings on the money loaned, and was faced prematurely with the reinvestment of a large sum of money, with the additional expenses thereof and the vagaries of the money market at the time.

### E. OTHER ISSUES

Three issues remain which, in view of the court's findings and conclusions above, are not controlling, but which deserve comment.

Defendant bank offered evidence that it was the practice of banks in Michigan to ignore the "uniformity" requirement of re-payment as set forth in the Industrial Loan Act. As the court recalls the testimony, it went to a custom practiced by national banks and not state banks. For a national bank to take advantage of such a custom would be permissible under *Evans*, supra, if it were a custom or practice systematically followed by state banks. The proof that national banks have a custom of violating state law where state banks were not shown to have done likewise would, of course, be no defense. In view of the court's findings that the authority of a national bank to reserve interest in advance derives from federal and not state law, this question becomes immaterial.

A further issue raised by defendant, but not necessary for decision here, is whether the honest belief of defendant officers that they were operating within the recognized rules of the Comptroller of Currency would entitle them to escape from liability for an otherwise usurious transaction on the basis that they had not "knowingly" charged such rate. This would appear to the court to have been the question if the transaction here was otherwise usurious within the meaning of the National Banking Act. The court is of the opinion that they would not be so excused from liability by the art of their contrivances thus seeking to avoid it.

Defendant Bank has also sought to avoid liability by claiming that payment of the interest was in fact made by the successor corporation to plaintiff partnership. Again the court sees little merit in this position. The obligation on the mortgage and notes at all times remained with the partnership and its individual partners so far as Hackley Bank was concerned. The payment was made on their account and to their benefit although it was channeled through the corporation

in order to enable the loan to be paid off. Again, however, in view of the court's other findings, this appears to be immaterial.

An order of the court will be entered consistent with the above opinion.