597 A.2d 1377

**PROMENADE TOWERS MUTUAL
HOUSING CORPORATION**

v.

**METROPOLITAN LIFE INSURANCE COMPANY.**

**No. 2 Sept. Term, 1991.**

Court of Appeals of Maryland.

Nov. 8, 1991.

G. Vann Canada, Jr. (Miles & Stockbridge, both on brief), Rockville, for petitioner.

Charles A. Trainum, Jr. (John F. Hyland, Jr., Christopher J. Kersting, Trainum, Snowdon, Hyland & Deane, P.C., all on brief), Washington, D.C., for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

RODOWSKY, Judge.

In this case a debtor claims the right to prepay in full the debt incurred in a commercial transaction and secured by a deed of trust that is silent on prepayment. We shall apply the general rule, namely that, absent a statute or agreement permitting prepayment, the mortgagor has no right to prepay. But, before we reach that conclusion, we must address the debtor's contention that the Maryland rule on mortgage prepayment is the opposite of the general rule. That contention requires us to divine the reasoning underlying the mandate in a 1794 decision of this Court that was issued unaccompanied by any reported or unreported opinion.

Petitioner, Promenade Towers Mutual Housing Corporation (PTMHC), owns a housing complex known as The Promenade in Montgomery County. As of 1975, the respondent, Metropolitan Life Insurance Company (Metropolitan), held a deed of trust on the property securing a $23 million indebtedness, evidenced by a single note that consolidated certain prior notes. Subsequently, that consolidated note and deed of trust were twice modified. In June 1980 the "First Modification" provided for an annual interest rate of fourteen percent through June 1990 and for an adjustable rate of at least fourteen percent from July 1990 through June 2005. The First Modification included the following right of prepayment:

> "From and after July 1, 1989, Borrower shall have the right to prepay, without the imposition of any prepayment fee, the entire unpaid principal sum evidenced by this Note, but no part thereof, provided that (a) such prepayment is made on the date [of] any monthly installment ... (b) Borrower shall have given Beneficiary at least Sixty (60) days' prior irrevocable written notice ... (c) such prepayment is accompanied by payment of all interest accrued under this Note to the date of such prepayment.... There shall be no right of prepayment prior to July 1, 1989."

PTMHC negotiated a refinancing with Metropolitan, resulting in the "Second Modification," dated September 1, 1986, and prepared by Metropolitan. The Second Modification reduced the interest rate to 11.875%, maintained the monthly payments at essentially the same level as under the First Modification, and provided for a final, "balloon" payment due on September 1, 1996. The Second Modification did not contain an explicit clause on prepayment rights.

The Second Modification set forth the terms of the note, as thereby modified. Those terms were introduced as follows: "The Consolidated Note is hereby modified and amended so that, from and after the date of this Agreement, the Consolidated Note shall read and be deemed to read in full as follows." The paragraph following the promissory note, as modified, provided:

"4. Borrower hereby confirms and reaffirms the terms, covenants and conditions of the Consolidated Note, as amended hereby, and hereby confirms and reaffirms its promise to pay to the Beneficiary . . . the full principal amount evidenced by the Consolidated Note, with interest thereon, all in accordance with the terms of the Consolidated Note, as amended hereby."

Additionally, paragraph 8 of the Second Modification provided:

"That, except as amended hereby, nothing herein contained invalidates or shall impair or release any covenant, condition, agreement or stipulation in the Consolidated Note as previously amended and Consolidated Deed of Trust as previously amended, and the same, except as amended hereby, shall continue to be in full force and effect, and Borrower further covenants and agrees to perform, comply with and abide by each and every of the covenants, agreements, conditions and stipulations of the Consolidated Note and Consolidated Deed of Trust, as amended hereby."

In January 1989, PTMHC wrote to Metropolitan, expressing its intent to prepay the debt after July 1, 1989. Metropolitan replied that the Second Modification had extin-

guished the right of prepayment "as consideration for the reduction of the [interest] rate."

PTMHC sought a judgment declaring that it could prepay the debt. The circuit court, on summary judgment, entered the declaration sought by PTMHC. The judge reasoned that the Second Modification did not extinguish the right of prepayment contained in the First Modification, but incorporated that right by reference. The judge alternatively decided that a mortgagee may prepay when the writings are silent as to any such right.

Metropolitan appealed to the Court of Special Appeals, which reversed. *Metropolitan Life Ins. Co. v. Promenade Towers Mut. Hous. Corp.*, 84 Md.App. 702, 581 A.2d 846 (1990). That court held that Maryland follows the general rule precluding prepayment, absent a specific clause permitting prepayment. The intermediate appellate court also construed the Second Modification not to incorporate the right to prepay that had been expressed in the First Modification.

PTMHC petitioned for certiorari. The petition cited, for the first time in this litigation, *McHard v. Whetcroft*, 3 H. & McH. 85 (1794). PTMHC contends that this 1794 decision established, and continues to provide as a matter of Maryland common law, that a mortgagor has the right to prepay absent a provision in the documents which limits or abrogates that right. We granted certiorari to resolve this important question.

I

It is clear that the majority rule in this country is, and for a long time has been, that, absent special agreement, the mortgagor in an unregulated transaction who promises to repay the loan, in installments at specified times or at a specified date, does not have a right to compel the creditor to accept prepayment. *See* 4 *American Law of Property* § 16.161, at 381 & n. 6 (1952); 3 R. Powell, *The Law of Real*

*Property* ¶ 457, at 696.12 n. 4 (1979); 14 *Williston on Contracts* § 1694A & n. 2, at 768 (Jaeger 3d ed. 1972).

Fairly typical of the cases is *Atlantic Life Ins. Co. v. Wolf*, 54 A.2d 641 (D.C.1947). The lender held the borrower's promissory note, secured by a first deed of trust on the borrower's real estate. The note called for monthly installments in specified amounts for fifteen years. Four years into the life of the loan the borrower insisted on prepaying the principal with interest only to the date of prepayment. The lender demanded, in addition, the interest which would have accrued to the maturity date of the loan under the payment schedule. The debtor paid the amount requested by the lender and, then, sued to recover part of the payment as usurious. The court held:

> "[T]he payment of the premium or charge involved cannot be considered as interest. The note constituted a contract which provided for payment of the loan on specified terms over a period of fifteen years. Unlike many notes of this kind it contained no 'on or before' provision and no other language reserving to the borrower any option or right to accelerate payment. Therefore, neither borrower nor lender had the right to advance the maturity date. When the borrower, for reasons advantageous to him, sought to do so he was merely asking a privilege and not demanding a right. He was seeking to pay off a fifteen-year contract with all of its accompanying obligations for interest, in less than five years. The lender was within its rights in demanding compensation for that privilege."

*Id.* at 642–43.

The presumption against prepayment has been widely cited and applied in cases involving promissory notes secured by real property, *see Houston N. Hosp. Properties v. Telco Leasing, Inc.*, 680 F.2d 19, 22, *aff'd on rehearing*, 688 F.2d 408 (5th Cir.1982); *Westminster Investing Corp. v. Equitable Assurance Soc'y*, 443 F.2d 653, 657 & n. 5 (D.C.Cir.1970); *Baybank Middlesex v. 1200 Beacon Properties, Inc.*, 760 F.Supp. 957, 965–66 (D.Mass.1991); *North-*

*way Lanes v. Hackley Union Nat'l Bank & Trust Co.,* 334
F.Supp. 723, 732 (W.D.Mich.1971), *aff'd,* 464 F.2d 855 (6th
Cir.1972); *Gutzi Assocs. v. Switzer,* 215 Cal.App.3d 1636,
1644, 264 Cal.Rptr. 538, 542 (1989) (citing earlier California
authority); *Dugan v. Grzybowski,* 165 Conn. 173, 176 & n.
2, 332 A.2d 97, 99 & n. 2 (1973); *Abbe v. Goodwin,* 7 Conn.
377, 384 (1829); *In re Agostini,* 33 A.2d 306, 309 (Del.Super.1943), *later proceeding,* 36 A.2d 33 (Del.Ch.1944); *MacIntyre v. Hark,* 528 So.2d 1276, 1277 (Fla.App.1988); *Bowen v. Julius,* 141 Ind. 310, 312, 40 N.E. 700, 700 (1895);
*Trahant v. Perry,* 253 Mass. 486, 489, 149 N.E. 149, 150
(1925); *Skyles v. Burge,* 789 S.W.2d 116, 118, 119 (Mo.App.
1990) (suggesting also that the rule should not apply in
residential mortgages when principal and interest to maturity are tendered); *Moore v. Kime,* 43 Neb. 517, 521, 61 N.W.
736, 738 (1895); *Peter Fuller Enters. v. Manchester Sav.
Bank,* 102 N.H. 117, 120, 152 A.2d 179, 181 (1959); *Geller v.
Fairmont Assocs.,* 172 A.D.2d 915, 568 N.Y.S.2d 202, 203
(N.Y.App.1991); *Arthur v. Burkich,* 131 A.D.2d 105, 106–
08, 520 N.Y.S.2d 638, 639–40 (1987); *Henderson v. Guest,*
197 Okl. 443, 445, 172 P.2d 605, 606 (1946); *Pyross v.
Fraser,* 82 S.C. 498, 64 S.E. 407 (1909); *McCausland v.
Bankers Life Ins. Co.,* 110 Wash.2d 716, 723, 757 P.2d 941,
944–45 (1988) (en banc), and in cases involving various
forms of land installment contracts, *see Carpenter v. Winn,*
39 Colo.App. 238, 566 P.2d 370, 371 (1977); *Lindsay Realty
Co. v. Bellina,* 320 So.2d 572, 574 (La.App.1975); *Baldwin
v. Corcoran,* 320 Mo. 813, 7 S.W.2d 967, 968 (1928); *Goetz
v. Hubbell,* 66 N.D. 491, 502, 266 N.W. 836, 840 (1936);
*Peryer v. Pennock,* 95 Vt. 313, 315, 115 A. 105, 105 (1921);
*Wilson v. Holyfield,* 227 Va. 184, 188, 313 S.E.2d 396, 398
(1984); Annotation, *Right of Purchaser Under Land Contract to Anticipate Time of Payment Fixed by Contract,*
17 A.L.R. 866, 866 (1922).

Alexander, *Mortgage Prepayment: The Trial of Common Sense,* 72 Cornell L.Rev. 288 (1987) (Alexander), dates
the origin of the rule to the early nineteenth century.

"Since the early nineteenth century the general rule has been that a debtor cannot, without the lender's consent, prepay a mortgage debt. More precisely, when a specific amount of indebtedness is secured by a mortgage covering the debtor's real property, and the note specifies a date certain for repayment of the debt, the debtor is not entitled to pay the indebtedness before that date unless the lender agrees to accept such payment. This is the requirement of perfect tender in time."

*Id.* at 290–91 (footnotes omitted). Professor Alexander presents the thesis, based on his "reexamination of the leading cases and commentaries," that it is "unjustified" to assume that "a borrower's inability to prepay mortgage indebtedness without the lender's consent was a principle embedded in the common law since its early beginnings." *Id.* at 289.

"Even at the turn of the nineteenth century," the article states, "debtors in the United States successfully argued for prepayment." *Id.* at 302. As examples the author cites *McHard v. Whetcroft,* 3 H. & McH. 85, 91 "(Md.1791)" and *Quynn v. Whetcroft,* 3 H. & McH. 136, 139 "(Md.1793)." *Id.* at 302 n. 76.[1] Professor Alexander describes the cases as ones in which "the Court of Appeals of Maryland reversed two lower court opinions which held that tender before the specified date was ineffectual." *Id.* at 302 (footnote omitted).

Inspired by Professor Alexander's discussion, and by the fact that the *Whetcroft* cases have never been reversed, PTMHC argues that for 200 years the common law of Maryland has been just the opposite of the general rule. PTMHC submits that a proper regard for *stare decisis* compels reversal of the judgment of the Court of Special Appeals in this case.

---

1. The dates of decision given in the citations are the dates of decision in the General Court.

## II

There are three *Whetcroft* cases, *McHard v. Whetcroft*, 3 H. & McH. 85 (1794) (*Whetcroft I*), *Quynn & McHard v. Whetcroft*, 3 H. & McH. 136 (1794) (*Whetcroft II*), and *Quynn & McHard v. Whetcroft*, 3 H. & McH. 352 (1797) (*Whetcroft III*).[2] Each is an appeal from the General Court. In each the reporter outlines the arguments of counsel. Each sets forth the mandate of this Court. In none is an opinion of this Court reported; in none does the Maryland Archives reveal an unreported opinion. All three cases involved debts evidenced by bonds due "at or upon" September 1, 1788.

The Maryland lawyer of today can reasonably read the arguments of counsel reported in *Whetcroft I* as consistent with an inference that the rationale underlying the mandate is that Maryland law permitted prepayment of a debt due at a specific time. Today's lawyer does not consider that a rejected tender of full payment, even if the debtor had a right to prepay and the rejection is wrongful, extinguishes the obligation to pay the principal amount of the debt and to pay interest to the date of tender. Yet, extinguishment of the underlying obligation by tender, without actual payment, was the result mandated by a statute in force at the time of the tenders in the *Whetcroft* cases. When the *Whetcroft* cases are read against that historical background, it is far from clear that we should infer that the unreported rationale is that for which PTMHC contends.

Chapter 9 of the Acts of 1777, February Session, (the Act) was in effect until March 20, 1781, when the Act's repeal by Chapter 5 of the Acts of 1780, October Session, became effective. Section 2 of the Act in part reads:

"That from and after the twentieth Day of *April* next, the Bills of Credit emitted and made current by Congress, and also the Bills of Credit emitted and made current by

---

2. *Whetcroft II* seems to involve a parol evidence issue and casts little light, that we can discern, on the issue before us.

Acts of Assembly or Resolves of the Conventions of this State, shall pass current therein, and be received in Payment and Discharge of all Manner of Debts ... whatsoever, due or hereafter to become due, payable or accruing upon or by Reason of any Mortgage, Bond, Specialty, Bill, Note, Account, Promise, or any other Contract, according to the Sums the said Bills respectively entitle the Bearer thereof to receive...." [3]

Section 3 of the Act provided:

"That if any Creditor, from and after the said twentieth Day of *April* next, shall refuse to receive any of the said Bills of Credit, when tendered in Payment of any Debt, or any other Demand above specified, such Creditor, so refusing, shall for ever be barred from suing for or recovering such Debt or Demand, if tendered, or so much thereof as shall be tendered as aforesaid ... and the said Debt or Demand ... shall be for ever extinguished; and if any Suit shall be commenced for the Recovery of such Debt or Demand, after Tender and Refusal as aforesaid, the Defendant may plead Payment, and give this Act and the special Matter in Evidence."

In *Moore v. Pearce,* 2 H. & McH. 236, 242 (Gen.Ct.1788), Judge Alexander C. Hanson said that "[t]he tender law [*i.e.,* the Act] indeed provides, that a debt shall not be recovered after tender and refusal, and compels the creditor, if required, to relinquish his security." [4]

In a 1787 work, compiling various Maryland statutes, by Judge (later Chancellor) Alexander C. Hanson and Samuel Chase, the authors described the Act as follows:

"This memorable law was repealed by the act of October, 1780, ch. 5. To this law, and to similar acts in the other states, is by some men ascribed the preservation of

---

3. Quotations from the early acts come from the version of the *Laws of Maryland* printed by Frederick Green.

4. As to the effect of the Act on security, see Acts of 1777, February Session, ch. 9, § 8.

our liberties, whilst others deny it the least merit, and, at the same time, impute to it the perversion of our morals, and every other political evil under which we have laboured since its passage."

*Laws of Maryland Made Since 1763* (A. Hanson & S. Chase eds. 1787).

State-issued paper money had devalued rapidly during the American Revolution, in part because of the heavy debt loads the states incurred in financing the war. According to one schedule of depreciation, 100 pounds in specie that had exchanged for 105 continental dollars in January of 1777, exchanged for 7500 dollars in February of 1781. 2 J.T. Scharf, *History of Maryland* 476 & n. 1 (1879 & photo. reprint 1967). By March 1781 the exchange rate reached 130:1, according to one report. *The Chancellor's Case*, 1 Bland 595, 633 (Md.Ch.1825). As of March 20, 1781, the bills of credit that had been made legal tender by the Act were ordered out of circulation, following a period when exchange for new currency could be effected at the rate of forty (old) to one (new). *See* Acts of 1780, October Session, ch. 5, §§ 2–3.

"Legal-tender laws" or "tender laws," such as the Act of 1777, were one of a variety of statutory responses state legislatures made in order to curb rampant wartime inflation. *See* J.T. Main, *The Sovereign States, 1775–1783*, at 235, 253 (1973). The legislators who enacted Maryland's tender law, which may have been the first one enacted, were quite aware that it would have an unjust effect on creditors. *See generally* R. Hoffman, *A Spirit of Dissension: Economics, Politics, and the Revolution in Maryland* 210–23 (1973). Charles Carroll of Annapolis, a wealthy man who bitterly opposed the Act from proposal to repeal, suggested that it be renamed " 'an act to take away the money of all creditors and give it to all their debtors.' " *Id.* at 250. Most other legislators, however, supported the measure for reasons that ranged from broad constituent support to personal greed to patriotism—some viewed the tender law as the "price of Revolution." Nevertheless, as

the inflation rate escalated some creditors simply refused to accept paper money, *id.* at 216; *see* R. Brugger, *Maryland: A Middle Temperament,* 1634–1980, at 136–37 (1988), which eventually resulted in a spate of debt and contract actions for the courts to resolve, *see, e.g., Dunlop v. Funk,* 3 H. & McH. 318 (Gen.Ct.1793); *Moore v. Pearce,* 2 H. & McH. 236 (Gen.Ct.1788).

In the *Whetcroft* cases, William Whetcroft had issued three or four bonds on September 24, 1778, after the Act was in effect. He promised to pay 442 pounds and 10 shillings, plus interest, "at or upon" September 1, 1788. There is no indication that the debts were secured by a mortgage. On March 7, 1781, Whetcroft sought to pay the bonds by tendering payment in the form of the greatly depreciated bills of credit that would go out of circulation about two weeks later. The creditors refused to accept the tenders.

*Whetcroft I* was an action of debt brought by one of the bondholders on September 30, 1788. Whetcroft pleaded, *inter alia,* payment on March 7, 1781. The case was submitted on special issues to a jury which found that, if the tender of March 7, 1781, was good, Whetcroft owed approximately thirteen pounds, but if the tender was not good, Whetcroft owed approximately eighty-eight pounds. The General Court in 1791 entered judgment for the creditor for the larger amount, with interest from September 24, 1778.[5]

In this Court counsel for the creditor submitted three points:

"1st. That the Act did not mean to make paper a tender, or payment in cases where gold and silver would not have been so, but only to place them on the same footing.

---

5. This verdict may be the jury's finding, in then-current money, of the value of the debt that had been incurred in the earlier currency.

"2d. That the contract being to pay on a certain day, and not on or before, a tender, or payment before, would not be good unless received and accepted in satisfaction.

"3d. In this case it was refused, and therefore the obligee is entitled to payment at the day, according to the terms of his contract."

*Whetcroft I,* 3 H. & McH. at 87–88.

Counsel for Whetcroft, responding to the first point, denied contending that the Act "meant to make paper a tender where gold or silver could not be tendered or paid; therefore the observation may be laid out of the case." *Id.* at 88. Debtor's counsel further denied that the language of the bond was intended to prevent speculation in currency by the debtor, and counsel further submitted that the bond should be construed in accordance with the civil law rule, which viewed the covenant to pay at a specific future date to be exclusively for the benefit of the debtor. In the June Term, 1794, this Court reversed the judgment of the General Court.

*Whetcroft III* was decided in the General Court in the May Term, 1795, after this Court's judgment in *Whetcroft I* had been handed down. The issue was whether Whetcroft could have successively tendered $1,175.67 in the same bills of credit to effect discharges of three separate debts, where the creditors consecutively refused the tenders. The creditors' counsel argued that the tenders did not extinguish all of the debts, but only one. The General Court held that each tender had operated as payment of the respective debts. The creditors appealed to this Court, where they were represented by Luther Martin.

Martin argued that the Act

"has established a new principle. It has made a tender of money, and a refusal to receive, a payment. It has forced persons to take money, and has put a tender and refusal of the same effect as if the money had been received; that is, it gives the person who had tendered an interest in what otherwise did not belong to him, to wit, the debt,

and that against the will of the creditor. It, by legal operation against his will, deprives him of a certain interest or property, to wit, the debt."

3 H. & McH. at 355. Counsel for Whetcroft agreed that, under the Act, a refusal of a paper tender extinguished the debt. *Id.* at 354.[6] Martin's conclusion was that "surely the creditor ought to be entitled, though against his will, to that which by law has been forced upon him as an equivalent for that which was his due." *Id.* at 356.

This Court reversed the General Court and remanded for further proceedings.

There are several legal hypotheses which appear to fit the known facts of the *Whetcroft* cases. Supporting PTMHC's position is the view that the Act did not override the "at or upon" provision of the Whetcroft bonds, that the fixed due date was solely for the benefit of the debtor, and that, because the debtor was free to prepay at any time, the Act operated only to give payment effect to the refusal to accept a tender made in bills of credit. This reading assumes that this Court decided *Whetcroft I* in accordance with the concession of Whetcroft's counsel.

Quite the opposite reading of the *Whetcroft* cases would accept Luther Martin's argument in *Whetcroft III*—that the effect of the Act was to force creditors to accept a tender contrary to the creditor's will. Under this reading, the literal provisions of the Act dealing with tender would render ineffectual the "at or upon" provisions of bonds issued after the Act's effective date. Because the Act gave a refused tender the effect of payment, it would have been immaterial whether the debt extinguished was payable at a specific future date or whether such a date was for the benefit of the creditor as well as of the debtor. Common law treated the creditor's acceptance of a tendered prepayment as extinguishing the debt, whether the debtor had a

---

6. The argument of Whetcroft's counsel is not reported in Brantly's edition of Harris & McHenry, but it is reported in the original edition.

right to prepay or not. It may well be that statutory "payment" under the Act operated in the same fashion.

The inconclusive reports in the *Whetcroft* cases do not establish, in terms of the issue before us, that a mortgage debtor has a right under Maryland common law to prepay a debt that has been agreed to be repaid on a fixed schedule or at a fixed time, unless prepayment is prohibited.

### III

Counsel have not directed us to, nor have we found, any Maryland appellate decision that clearly sets forth the circumstances under which a mortgagor had, at common law, the right to prepay. Nevertheless, other indicia persuasively demonstrate that Maryland common law on this issue accords with the general rule set forth in Part I, *supra.* Treatise writers associated with Maryland law have cited the rule of perfect tender in time. *See* H. Tiffany, *A Treatise on the Modern Law of Real Property* § 537, at 1235 n. 276 (1912); H. Ginsberg & I. Ginsberg, *Mortgages and Other Liens in Maryland* 236 (1936) ("mortgagee may refuse a tender made after or before the day agreed upon"). Virtually all of the general treatises since the mid-nineteenth century are in accord, e.g., 4 *American Law of Property* § 16.161, at 381 (1952) (citing lower court opinion in *Whetcroft II*); 55 Am.Jur.2d *Mortgages* § 425 (1971); 59 C.J.S. *Mortgages* § 447, at 695 (1949); 2 L. Jones, *The Law of Mortgages of Real Property* § 1137, at 596–97 (8th ed. 1928); 3 R. Powell, *The Law of Real Property* ¶ 457, at 696.12 n. 4 (1979); 9 G. Thompson, *Commentaries on the Modern Law of Real Property* § 4808, at 631 (1958 Repl.); Annotation, *Right of Purchaser Under Land Contract to Anticipate Time of Payment Fixed by Contract,* 17 A.L.R. 866, 866 (1922); *see generally* Alexander, 72 Cornell L.Rev. at 292 & n. 20.

The view that fixed dates for payment are exclusively for the benefit of the debtor is inconsistent with the rationale of *Meinecke v. Goedeke,* 195 Md. 373, 73 A.2d 445 (1950).

There, a dispute arose under a land installment contract. The sellers claimed a default that the buyers denied. The purchasers offered to continue making their regular payments, or to pay the entire balance. The sellers refused both offers, but a chancellor decreed that the sellers must accept the monthly payments. This Court affirmed, noting that, "[a]s the [sellers] refused to accept in a lump sum the balance of the purchase money due for the reason that they desire the 6% interest on this balance, the chancellor was correct...." *Id.* at 382–83, 73 A.2d at 448. Implicitly, the purchasers had no right to prepay.

Further demonstrating Maryland common law is Md.Code (1975, 1990 Repl.Vol., 1991 Cum.Supp.), § 12–126 of the Commercial Law Article (CL), enacted by Chapter 409 of the Acts of 1991. That statute deals with noncommercial loans secured by a mortgage on the borrower's primary residence. It provides that "[e]xcept to the extent expressly provided otherwise in the loan contract, a borrower may prepay all or part of outstanding unpaid indebtedness under a loan at any time." The General Assembly clearly understood that this statute altered the Maryland common law rule, as evidenced by a "Whereas" clause, deleted before final passage from the bill as introduced, that referred to the holding of the Court of Special Appeals in the case now before us. 1991 Md.Laws ch. 409, at 2499. There would be no need to enact a statute empowering borrowers to prepay, unless a right of prepayment is expressly negated, if, at common law, a mortgagor always enjoyed the right to prepay where the loan contract simply scheduled a date or dates for repayment, without further addressing prepayment.

■ For all the reasons set forth in Parts I, II, and III hereof, we hold that, under Maryland common law, a mortgagor or grantor under a deed of trust payable at a fixed date or dates in the future, does not have a right to prepay, absent provision for prepayment in the loan contract. Phrased another way, there is no presumption of prepay-

ment which must be negated by express contract provision in order to prevent prepayment.

## IV

PTMHC next invites us to change the common law and apply that change to this case. We are asked to adopt a presumption of mortgage prepayment on the grounds that the contrary rule restrains the free alienability of land. Recently, two states judicially have abrogated the presumption against prepayment. *See Hatcher v. Rose,* 329 N.C. 626, 407 S.E.2d 172 (1991); *Mahoney v. Furches,* 503 Pa. 60, 468 A.2d 458 (1983). Mindful of these two decisions, we nevertheless decline to adopt a general presumption of prepayment.

At its 1991 session the General Assembly addressed this subject and adopted a presumption of prepayment applicable only to noncommercial mortgages. CL § 12–126(a)(2). On this question of social and economic policy, it would be inappropriate for the judiciary to extend a presumption of prepayment beyond the line so recently drawn by the Legislature.

Moreover, we do not subscribe to the reasoning of the Pennsylvania court in *Mahoney.* According to that case, the dominant consideration is the effect a presumption concerning prepayment has on the free alienability of land, "since the fundamental purpose of the mortgage note in most instances is to secure a debt incurred in the purchase of land from which the debt arises rather than to secure investment income for the mortgagee." *Mahoney,* 503 Pa. at 65, 468 A.2d at 461. That analysis looks only at the debtor's side of many transactions. For most lenders, however, particularly commercial project lenders, and secondary-market mortgagees, the dominant purpose *is* to secure investment income.

Nor is resolution of the appropriate rule merely a question of choosing between the competing policies of free alienability of land and of protecting investors' income, as

the Pennsylvania court implied. That court noted that the "presumption [against prepayment] arises ostensibly because private mortgage notes are becoming more and more valuable as an investment instrument." *Id.* at 64, 468 A.2d at 461. This does appear to be the most important economic justification of the presumption today. *See* Weinberger, *Neither an Early nor a Late Payor Be?—Presuming to Question the Presumption Against Mortgage Prepayment*, 35 Wayne L.Rev. 1, 15 (1988). But the economic justification has a variety of aspects, including protection against unwanted transaction costs, predictability in return on investment, and stability provided by regular payments. Alexander, 72 Cornell L.Rev. at 310–17.

The majority rule also has a philosophical justification based on the concept of mutuality. Courts have long reasoned that the debtor should have no right to prepay if the creditor has no right to accelerate or call the loan. *See, e.g., Peryer v. Pennock*, 95 Vt. 313, 315–16, 115 A. 105, 105 (1921); Alexander, 72 Cornell L.Rev. at 317–19. The related philosophical justification of freedom of contract was set out in one of the earliest cases on the rule, which criticized a debtor's insistence on a right to prepay as an attempt "to substitute another contract for that which the parties have entered into." *Abbe v. Goodwin*, 7 Conn. 377, 384 (1829).

In *Hatcher v. Rose*, 407 S.E.2d 172, the Supreme Court of North Carolina was faced with fathoming the common law of that state on this issue. That court held that, in North Carolina, the mortgagor enjoys a right to prepay, absent express prohibition. The conclusion was based primarily on inferences drawn from certain North Carolina statutes. The conclusion was also supported by a leading text in North Carolina on the real property law of that state.[7]

---

7. It also appears that the standard form of deed of trust in use in North Carolina and promulgated by the North Carolina Bar Association provides for the date of final payment "if not sooner paid." *Hatcher v. Rose*, 407 S.E.2d at 176.

On the question of whether the specific contract between PTMHC and Metropolitan would create an unreasonable restraint on alienation, we note that this Court has upheld a considerably longer restraint in the context of a land installment contract. *See Pierson v. Pyles*, 234 Md. 119, 124, 197 A.2d 890, 893 (1964) ("It may take thirty-seven more years to acquire an unencumbered title in the [purchasers], but it can be done....").

## V

■ Finally, we must construe the First and Second Modifications. PTMHC's principal contention is that the prepayment provision of the First Modification was incorporated by reference into the Second Modification. As we explain below, the documents cannot reasonably be construed to achieve that result.

The First Modification was made with Metropolitan by Promenade Associates, a Maryland limited partnership. That partnership was a predecessor in title to PTMHC, a Maryland corporation. Each modification states that "[t]he Consolidated Note is hereby modified and amended so that, from and after the date of this Agreement, the [Consolidated] Note shall read and be deemed to read in full as follows." Each modification then sets forth the paragraphs of a promissory note secured by deed of trust. Each modification thereafter contains a description of the land, provisions for additional security, and other provisions of a deed of trust.

With respect to the restated notes, the First Modification recites a principal balance of $22,195,667.74 as of June 1, 1980, payable at the rate of $267,273 per month, including interest, with the entire principal balance due July 1, 2005. Interest is at the rate of fourteen percent per annum until July 1, 1990, and is thereafter adjusted upwards, at five year intervals, should a higher rate be determined by a formula set forth in the First Modification.

In the Second Modification, in lieu of the above, is the promise to pay a principal balance, acknowledged to be $21,206,300.03 as of September 1, 1986, at the rate of $266,000 per month, including interest at the rate of 11.-875% per annum. The outstanding balance on September 1, 1996, is then due in full.

The note in the First Modification contains a definition of the term "deed of trust," which embraces all of the antecedent security instruments of the project. That definition is repeated in the Second Modification. Also set forth in the First Modification note and repeated, substantially verbatim, in the Second Modification note, are provisions dealing with late charges, acceleration of principal on default, stepped-up interest to eighteen percent during default, costs of collection, including attorney's fees, waivers of exemptions, non-waiver of remedies by the lender, an automatic reduction of interest to any usury ceiling in the event it is exceeded, a warranty that the loan is for commercial purposes, and a choice of Maryland law.

Found in the First Modification, but not repeated in the Second Modification, is the prepayment provision, quoted in the statement of facts preceding Part I, *supra*. Accompanying that prepayment provision in the First Modification is a companion paragraph which gives Metropolitan the option to declare a default and accelerate the entire indebtedness, in the event the debtor, after giving notice of an intention to prepay, fails to prepay. The provision is obviously for the benefit of Metropolitan, which might commit to lend to some other borrower the funds anticipated to be received on prepayment. This companion provision to the prepayment right is not set forth in terms in the Second Modification.

The note in the First Modification contains an exculpation clause as to personal liability, but that is not found in the Second Modification.

The note in the First Modification contains a provision dealing with the scenario of default, acceleration of the entire debt, and then payment in full by the debtor prior to

foreclosure sale. Under those circumstances the debtor is obliged to pay a prepayment fee of five percent of the unpaid principal balance. No comparable provision appears in the Second Modification.

In paragraph four of the First Modification the borrower "confirms and reaffirms the terms, covenants and conditions of the Consolidated Note, as amended hereby...." Paragraph four of the Second Modification, quoted earlier, is the same.

The First Modification, in paragraph eight, states: "That the Consolidated Deed of Trust and all the terms, covenants, conditions, agreements and stipulations thereof shall remain in full force and effect except as amended hereby." That language is reproduced virtually verbatim in paragraph seven of the Second Modification.

Paragraph nine of the First Modification is identical to paragraph eight of the Second Modification, with the exception that the phrase set forth below in brackets appears only in paragraph eight of the Second Modification. The two paragraphs read:

"That, except as amended hereby, nothing herein contained invalidates or shall impair or release any covenant, condition, agreement or stipulation in the Consolidated Note [as previously amended] and Consolidated Deed of Trust [as previously amended], and the same, except as amended hereby, shall continue to be in full force and effect, and Borrower further covenants and agrees to perform, comply with and abide by each and every of the covenants, agreements, conditions and stipulations of the Consolidated Note and Consolidated Deed of Trust, as amended hereby."

PTMHC contends that the prepayment provision is incorporated by reference into the Second Modification by paragraph eight under which "any covenant ... except as amended hereby, shall continue to be in full force and effect." The Court of Special Appeals, referring to the phrase, "as amended hereby," appearing in paragraph four,

held that provisions omitted from the Second Modification were deleted from the prior agreement, that deletion is a form of amendment, and that the deleted prepayment provision was not carried forward by paragraph four which confirmed the prior agreement only "as amended hereby."

PTMHC now argues to us that the Court of Special Appeals failed to consider paragraph eight of the Second Modification. In paragraph eight the covenants of the First Modification, "except as amended hereby, shall continue to be in full force and effect...." PTMHC says that one of the amendments effected by the Second Modification is the confirmation in paragraph four, which reaffirms the provisions of the First Modification. The deficiency in this argument is that paragraph four is itself qualified, in that it confirms the Consolidated Note only "as amended hereby."

Construing the Second Modification as a whole, it is apparent that the scheme followed by Metropolitan, as the draftsperson, was to bring forward in modified form, those provisions of the note which were being modified, to bring forward verbatim those provisions which continued unchanged, and to delete those provisions which were being omitted. Metropolitan was dealing with a new owner, PTMHC. PTMHC had not signed any prior deed of trust, the Consolidated Note or the First Modification. But PTMHC was becoming liable for more than $20 million owed by the predecessor limited partnership. It was entirely reasonable for the creditor to have the new debtor, by its signature to the Second Modification, confirm and reaffirm the provisions of the Consolidated Note, as amended, and to agree that the provisions of the Consolidated Note, as amended, continued in full force and effect. That is not an incorporation by reference of deleted provisions.

Further, PTMHC's argument proves far too much. Nothing in the asserted incorporation by reference limits its operation to the prepayment provision. Indeed, because the language which PTMHC relies upon is also found in the First Modification, the argument would have the Second Modification include, by incorporating the First Modifica-

tion, any provisions which might have been deleted from the Consolidated Note by omission from the First Modification.

Inasmuch as there is no express prepayment right, provided either directly or by incorporation by reference in the Second Modification, and because a right of prepayment is not presumed, PTMHC has no right of prepayment.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PROMENADE TOWERS MUTUAL HOUSING CORPORATION.