681 A.2d 568

**Douglas W. FULTZ et al.**

v.

**Roberta Souder SHAFFER.**

**No. 1657, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

Aug. 29, 1996.

Matthew W. Black, Jr. (Heeney, Armstrong & Heeney, on the brief), Rockville, for appellant, Fultz.

Steven M. Gilbert, Assistant County Attorney (Charles W. Thompson, Jr., County Attorney and Linda B. Thall, Senior Assistant County Attorney, on the brief), Rockville, for appellants Montgomery County and Chief Administrative Officer.

Cassandra P. Hicks (Pasternak & Fidis, P.A., on the brief), Bethesda, for appellee.

Argued before CATHELL, HARRELL and MURPHY, JJ.

CATHELL, Judge.

In this case, we are asked to determine whether disability retirement benefits, received as a result of an injury occurring after the parties' divorce, were properly considered retirement benefits pursuant to a settlement agreement between the parties, which entitled the wife to share in a portion of her former husband's "pension and retirement benefits" if, as, and when paid to him. The trial court found that appellee, Roberta Shaffer, was in fact entitled to receive a share of those disability benefits, despite the claim by her former husband, appellant, Douglas Fultz, that the settlement agreement did not encompass them. He appealed the trial court's judgment, asking:

> Whether the Trial Court erroneously awarded the former wife a marital share of the former husband's disability

benefits paid as a result of injury and total disability occurring after the divorce.

We are advised that, subsequent to taking this appeal, Douglas Fultz died; we are told that a suggestion of death has been, or will be, filed with this Court. We note that, because the underlying case involves the classification of significant property rights, our disposition of this appeal will not abate as a result of Mr. Fultz's death. *See Goldman v. Walker,* 260 Md. 222, 224–25, 271 A.2d 639 (1970).

Also at issue on appeal is a provision in the parties' settlement agreement that required Mr. Fultz to elect a 100% joint and survivor annuity in favor of Ms. Shaffer. Ms. Shaffer asked the trial court to order her former husband to make that election. Montgomery County, which administers the retirement system at issue, disputed Mr. Fultz's ability to do so more than six years after the divorce. The County, also an appellant in the instant appeal, is aggrieved by the trial court's order that the election be made and asks:

A. Was the [trial] court authorized to award a 100% joint and survivor benefit to the former spouse?

B. Did the [trial] court have a legal basis for overruling the administrative order below that the former spouse was ineligible for designation as a 100% joint and survivor beneficiary?

We shall address each appellant's concerns in turn, following a recitation of the relevant facts.

## CHRONOLOGY OF THE CASE

The parties were married in August of 1977, approximately three months after Mr. Fultz commenced employment as a Montgomery County police officer. He remained so employed throughout the marriage. His status as a Montgomery County employee entitled him to membership in the Montgomery County Employees' Retirement System (ERS), which was established "to maintain a system of retirement pay and benefits for [Montgomery County's] employees which is adequately funded and insures employees sufficient income to

enjoy during their retirement years." Montgomery County Code § 33–34 (1994); *see also id.* § 33–36(b).[1] In 1988, the parties separated and, on February 14, 1990, they entered into a Voluntary Separation and Property Settlement Agreement (the Separation Agreement), whereby various personal and property issues were resolved, including Ms. Shaffer's entitlement to a portion of Mr. Fultz's accrued pension benefits upon retirement and a 100% joint and survivor annuity. Specifically, they agreed:

> 9. *DIVISION OF PENSION AND RETIREMENT BENEFITS*
>
> ... The parties acknowledge that the husband's pension and retirement benefits earned during the marriage are marital property, and as such, are to be divided equally between [them].
>
> Therefore, if, as and when the husband retires, or is eligible for retirement, the wife shall receive, by direct payment from Montgomery County, one-half of the monthly pension and retirement benefits, specifically including all Cost of Living Adjustments (COLAS) thereon, earned during the marriage, to be calculated as follows:
>
> $$\text{Wife's monthly pension benefit} = \frac{**}{2} \times \text{Husband's monthly pension benefits}$$
>
> $$** = \frac{\text{Number of years of marriage}}{\text{Number of years of service}}$$
>
> The husband further agrees to select a 100% joint and survivor pension, and shall irrevocably designate the wife as a survivor and lifetime beneficiary of the pension and retirement benefits acquired through his employment with Montgomery County. The wife shall be entitled to the benefits payable to the surviving spouse based upon the above formula. In the event that the husband fails to comply with the requirements of this Article, and fails to designate the wife as the surviving spouse and beneficiary of death bene-

---

1. All statutory citations shall hereinafter refer to Article III, chapter 33 of the Montgomery County Code (1994), unless otherwise indicated.

fits payable under the Employees' Retirement System of Montgomery County, his estate shall be liable to the wife for the full amount of the husband's death benefits to which she would be entitled, pursuant to this paragraph.

. . . .

### 10. *QUALIFIED DOMESTIC RELATIONS ORDER*

The husband specifically agrees to cooperate with the wife, to perform any acts, and to execute any documents, necessary to enable the wife to prepare obtain [sic] a Qualified Domestic Relations Order, to effectuate the provisions of Article [9] above. The Qualified Domestic Relations Order shall designate the wife as the alternate payee/surviving spouse under the Employees' Retirement System of Montgomery County, and shall recognize her right to receive her designated portion of the husband's retirement benefits as a division of marital property. The husband further agrees . . . in the event that any Qualified Domestic Relations Order is rejected by the retirement system administrators, for any reason, to cooperate fully with the wife and modify any such O[r]der, to obtain its approval and acceptance by the administrators. The parties agree that the Court shall retain continuing jurisdiction over the Order until it has been approved and accepted by Montgomery County, and/or the plan administrators.

On February 23, 1990, the parties were divorced by decree entered in the Circuit Court for Montgomery County. The Separation Agreement was incorporated, but not merged, into the final decree. Pursuant thereto, the court retained continuing jurisdiction over the case, pending final approval of the Qualified Domestic Relations Order (QDRO).

Thereafter, Mr. Fultz was found to have sustained a service-connected disability and was placed on disability retirement on February 19, 1992. In conjunction therewith, he began receiving disability benefits.[2] Thereafter, in February of 1993, Ms.

---

**2.** Under the Montgomery County Code, Mr. Fultz became eligible to receive, until the date of his retirement, disability benefits in the

Shaffer's attorney contacted the County Attorney for Montgomery County, confirming an earlier discussion that concerned the effect of Mr. Fultz's disability upon Ms. Shaffer's rights to her former husband's retirement benefits under the Separation Agreement and whether Ms. Shaffer was entitled either to share in the disability benefits then being received by Mr. Fultz or begin receiving payment of her share of the accrued retirement benefits.[3] Ms. Shaffer's attorney reiterated the County's position that disability benefits are not divisible in divorce, *see* § 33–54, and stated her understanding that Ms. Shaffer's share of the retirement benefits under the Separation Agreement remained unchanged by Mr. Fultz's disability: "She has the same options with respect to the receipt of her portion of the marital retirement benefits as if [Mr. Fultz] had not retired on disability." The County Attorney agreed with Ms. Shaffer's summary of their discussion, adding, "The fact that [Mr. Fultz] has already retired on a disability retirement has no [e]ffect on the amount which [Ms. Shaffer] receives . . ., nor does it affect the dates on which the benefits could commence."

### Mr. Fultz's Petition

Prompted by Ms. Shaffer's attempts to ascertain her right, if any, to the disability benefits under the terms of the Separation Agreement, Mr. Fultz sought, on March 25, 1993, a formal determination of the issue by the Chief Administrative Officer (CAO) of the ERS.[4] Specifically, he posed the following question to the CAO for resolution:

amount of a fixed percentage of his annual salary at the time of the disabling event. § 33–43(h)(1).

3. The County Attorney and Ms. Shaffer's attorney had discussed the matter as early as 1991, when Mr. Fultz was first disabled and had applied for disability retirement.

4. The Chief Administrative Officer of the Montgomery County ERS is responsible for the administration of the retirement system and the interpretation of all provisions of the retirement regulations, as set forth in the Montgomery County Code, including the computation of benefits. § 33–47(c)–(d); *see also* § 33–56(a).

When a police officer/pensioner separates from his wife and they sign a Separation Agreement in which she is entitled to a marital share of his pension "if, as, and when he receives it," and they are divorced, and the husband/pensioner thereafter *retires on disability retirement,* what, if any, is the wife's entitlement to any kind of pension benefit?

He then restated Ms. Shaffer's position as seeking a reduction in Mr. Fultz's disability benefits "by the marital portion of the vested accrued benefit, *even though (apparently) he will not be receiving* **his** *share of the vested accrued pension."* His argument to the CAO was predicated upon his belief that "the disability retirement fund exists independent of the vested accrued benefit pension system and it is, in effect, an insurance policy against service related injuries and resulting incapacity." Thus, he argued, his former wife was not entitled to any part thereof.

The CAO issued his ruling on May 21, 1993, flatly rejecting Mr. Fultz's characterization of the nature of his disability benefits and stating that a "service connected retirement disability benefit is a special form of retirement benefit." The CAO continued:

I have interpreted the term marital property to be no more then the vested accrued benefit as of the date of the divorce. That vested accrued benefit can be split in whatever percentage the parties agree. . . .

If the former spouse has an entitlement to 50% of the vested accrued benefit, the member of the ERS will have his or her benefit reduced by that amount. . . . [O]ur form agreement . . . states, among other things, that if a member becomes entitled to the . . . disability benefit, that member's benefit is reduced by 50% of the vested accrued benefit that pertains to the former spouse.

. . . The determination of Mr. Fultz's disability occurred after the divorce, and accordingly, it will not affect the amount of the former spouse's benefit. By the same reasoning, Mr. Fultz's benefit will be subject to the same

reduction, as a result of the former spouse's share, after his disability.

The CAO also ruled that Ms. Shaffer had no present right to participate in the disbursement of Mr. Fultz's disability benefits then being received, but stated that the earliest date upon which Ms. Shaffer could begin receiving any payments under the Separation Agreement was 1997, the first date upon which Mr. Fultz could have retired.[5]

Mr. Fultz filed an appeal from the CAO's ruling with the Merit System Protection Board (MSPB), claiming that the CAO "misinterpreted" the "if, as and when" language of the Separation Agreement, mischaracterized the nature of his disability benefits, and erred in finding Ms. Shaffer entitled to any part thereof. He sought thereby "[a] ruling stating that the former Mrs. Fultz will not receive a marital portion of [his] accrued vested benefit unless and until [he] actually receives it." In the alternative, he requested that there be a recalculation of that portion to which she would be entitled. Emphasizing the "if" in the "if, as and when" language of the parties' agreement, he further stated that he "may never actually receive his vested accrued retirement benefit and the extent of his entitlement depends on when payments begin." In essence, he was arguing that, as long as he was receiving disability payments, he would never achieve retirement status and, thus, his ability to receive the accrued pension benefits would never mature. *See Lookingbill v. Lookingbill,* 301 Md. 283, 285, 483 A.2d 1 (1984) (Maturity connotes the time at which a pension becomes due and payable.). Until maturity, he maintained, his former wife would not be entitled to begin receiving her share of the retirement benefits.

Montgomery County submitted its own letter to the MSPB, setting forth its position in the matter. It began by agreeing with Ms. Shaffer that her share of Mr. Fultz's retirement

---

**5.** Under the ERS, Mr. Fultz was first eligible for retirement after twenty years of service, in 1997; this is termed his "early retirement date." § 33–38(e). The year 2002 signaled his "normal retirement date," after twenty-five years of service. § 33–38(a).

benefits remained unchanged by his disability retirement— that is, in either 1997 or 2002, her fifty percent share was to become due and payable, at which point Mr. Fultz's benefits were to be appropriately reduced, whether he chose to begin receiving his accrued pension benefit or continued to receive a disability retirement benefit.[6] The County further rejected Mr. Fultz's argument that, as long as he continued receiving disability benefits, his retirement date would never arrive and there would be no occasion to pay Ms. Shaffer her share of the accrued benefits. Citing the Montgomery County Code, the County contended that Mr. Fultz had the option to receive a retirement pension benefit at either his early or normal retirement date, whether he chose to accept it or not, and any benefits that would have been received thereafter, whether in the form of continued disability payments or accrued pension benefits, would have been divided between him and his former wife. Seeking affirmance of the CAO's ruling, the County concluded that any method of disbursement other than that suggested by the CAO would create a payment of benefits exceeding the amount payable to both Mr. Fultz and Ms. Shaffer.

On October 23, 1993, the MSPB issued its decision affirming the CAO's ruling. The MSPB found Mr. Fultz's contention that his retirement date would never arrive so long as he was on disability to be "contrary to applicable law and the separation agreement which establish that [Ms. Shaffer]'s pension benefit became fully vested and determined at the time of the parties' divorce in February 1990." The MSPB further found that, "[s]ince the disability events occurred after the separation and final divorce of the parties, those events do not cancel the former spouses [sic] pension benefit. However," the MSPB continued, "the former spouses [sic] benefit would

---

6. But for his death, Mr. Fultz would have continued to receive disability benefits until the date upon which he otherwise would have been eligible to retire, at which time, he would have been required to elect to begin receiving pension benefits in lieu of disability benefits, or continue receiving disability benefits; he could not have received both. § 33–43(i)(1).

reduce depending on whichever benefit is payable to [Mr. Fultz]," pursuant to his election at the time of his scheduled retirement.

Aggrieved by the MSPB's affirmance, Mr. Fultz appealed the matter to the Circuit Court for Montgomery County, on November 24, 1993. In his memorandum to the court, Mr. Fultz, again emphasizing the "if" in the "if, as and when" language of the Separation Agreement, stated that, "unless he recovers and returns to work[, he] will never actually receive the vested benefit which he accrued during the marriage." Thus, he maintained, "the real issue of the case is whether the former wife/non-pensioner spouse is entitled to any payment of purported marital property." He contended that the ERS, MSPB, and the County Attorney's Office "failed to apply the correct decisional law and, in effect, re-wrote the parties' agreement." He began by attacking the time frame within which the CAO calculated Ms. Shaffer's benefit, stating that

> [t]he *Bangs*[7] formula obviously contemplates a fraction which constantly changes, whereas the MC–ERS interpretation fixed the former spouse's entitlement at a specific dollar amount of the vested accrued benefit. *as of the date of divorce* (contrary to the plain language of the agreement) *regardless of any subsequent events.* This is clearly a re-writing of the agreement.

---

7. *Bangs v. Bangs,* 59 Md.App. 350, 475 A.2d 1214 (1984). There, we held that a formulaic calculation of an individual's share of his or her former spouse's future pension or retirement benefits, to the extent accrued during the marriage, if, as, and when paid to the pensioner, based upon a fraction/multiplier derived from the total years of marriage over the total years of credited employment, was a permissible manner in which to determine the fixed percentage of the future retirement benefits to be paid to the nonpensioner when benefits are paid to the employee. The *Bangs* Formula, as it has come to be known,

> is to be used in situations in which, at the time of the divorce, the employee-spouse has been employed for a period of time greater than the length of the marriage and thus, a portion of the pension was earned outside of the marriage. In this respect, the fraction is used to determine the *marital* portion of the benefits.

*Hoffman v. Hoffman,* 93 Md.App. 704, 719, 614 A.2d 988 (1992).

He then claimed that "the faulty interpretation of the [Separation A]greement led the MC–ERS and the MSPB to avoid analyzing the nature of the retirement benefits" that he was then receiving. He argued that a disability retirement fund is unlike a " 'regular' pension" because it is not funded by income earned by the pensioner during the marriage, thereby insulating it from classification as marital property upon divorce. Instead, he reasoned, the payments he was receiving as a result of his disability were akin to payments made pursuant to a personal injury or workers' compensation claim.

## Ms. Shaffer's Petition

At the same time as Mr. Fultz's appeal to the circuit court, Ms. Shaffer sought a two-pronged ruling by the CAO that confirmed her entitlement to a portion of her former husband's disability benefits, then being received solely by him and, under *Bangs*, that calculated the payment of any benefits to be received by her according to the terms of the Separation Agreement, which refers to Mr. Fultz's retirement date, rather than the date of divorce, as the dispositive date. Ms. Shaffer also claimed entitlement, under the Separation Agreement, to "the entire 100% survivor annuity based on Mr. Fultz's benefits," and asked the CAO to order Mr. Fultz to elect said annuity in her favor, the payments therefor to be deducted from his share of benefits only.

As a result of the pendency of the parties' cases in separate venues, Montgomery County moved the circuit court, on February 7, 1994, to remand Mr. Fultz's case to the MSPB or stay its proceedings to await the ruling of the CAO on Ms. Shaffer's petition. Contemporaneously therewith, Ms. Shaffer, in two motions, moved the court for leave to intervene in her former husband's case and to consolidate his appeal with their divorce case, over which the court had continuing jurisdiction because no QDRO had yet been submitted and approved. In her motions, Ms. Shaffer claimed that her position was not being adequately represented because the County, although believing her to be entitled to benefits, believed the maturity date to be that of Mr. Fultz's scheduled retirement, rather

than February 19, 1992, the date of his disability retirement. She also claimed that, by his actions, Mr. Fultz had breached their Separation Agreement.[8]  On March 11, 1994, the circuit court permitted Ms. Shaffer's intervention and ordered that her Motion to Enforce and Mr. Fultz's appeal from the MSPB be consolidated.

When the CAO issued his ruling, on April 8, 1994, his decision mirrored the ruling rendered by the CAO previously in respect to Mr. Fultz's petition: Ms. Shaffer was not entitled to receive any portion of Mr. Fultz's disability benefits; her right to receive any retirement benefits was to become due and payable in 1997 or 2002.  The CAO further found that, "[u]nder the terms of the ERS, Mr. Fultz cannot elect a 100% survivor annuity with respect to a former spouse."  He did note that, had such an election been possible, the cost therefor would have been borne by both parties, rather than solely Mr. Fultz.

In analyzing the issues Ms. Shaffer raised for his consideration, the CAO began by noting that, although the Separation Agreement memorialized the parties' accord, his interpretation and application thereof would necessarily be "within the constraints of the ERS" regulations.  Turning to the matter of the time at which the division of retirement benefits is to be made, the CAO found that "the formula used in the Separation Agreement could result in post-divorce property being transferred to the former spouse," and concluded that "the retirement plan property to be transferred pursuant to the divorce must be that property calculated as of the date of the divorce." He found support for this in the Separation Agreement's reference to the division of pension and retirement benefits *earned during the marriage* and, thus, "interpreted the term marital property to be no more than the vested accrued benefit as of the date of the divorce."

---

8.  Ms. Shaffer also filed a Motion to Enforce the parties' Separation Agreement, on February 8, 1994, challenging the interpretation given to the Separation Agreement by both the County and her former husband.

Regarding Ms. Shaffer's claim of present entitlement to a portion of Mr. Fultz's then disability benefits, the CAO distinguished the *Bangs* case, stating that the parties' agreement "does not entitle the former spouse to receive a portion of *each* payment made from the ERS," but rather a portion of the " 'monthly ... benefits [ ... ] earned during the marriage.' " Because Mr. Fultz became disabled after the parties' divorce, he reasoned, Ms. Shaffer "is not entitled to any portion of the payments made from the ERS which result *solely* from his disability." The CAO further stated that Ms. Shaffer could not commence receiving any portion of the accrued pension benefits prior to Mr. Fultz's then scheduled retirement date; his receipt of disability payments did not entitle her to receive an early distribution of her benefits.[9] Relying upon ERS regulations and restrictions, the CAO then declined to order Mr. Fultz to elect a 100% survivor annuity in her favor, citing § 33–44(a)(3), which limits this election to a spouse or child; because the parties were divorced, they were, necessarily, no longer spouses. In an attempt to reconcile what he perceived to be the parties' intent and the ERS's regulations, however, the CAO did state that Ms. Shaffer would "receive her portion of the retirement benefits, in the form of a ten-year certain and continuous annuity, subject to the appropriate actuarial reductions."

Aggrieved by the CAO's ruling, Ms. Shaffer appealed the matter to the MSPB. In her memorandum to the MSPB, she challenged, *inter alia,* the CAO's decision that her benefits were to be valued as of the date of the parties' divorce; the *Bangs* Formula "applies to the *monthly pension benefits to be paid at the time of actual retirement.*" She argued that "[t]he formula is not applied to the value of the benefits as of the date of divorce since to do so would deprive the former spouse of any increase in her value of benefits from date of divorce to date of retirement." Such a deprivation, she maintained, "has

---

9. The CAO also noted that, under the ERS, Mr. Fultz's disability benefits were being reduced to reflect the amount of vested accrued benefits payable to Ms. Shaffer.

a substantial impact on the amount of money . . . and . . . the value of the property right she received in the divorce settlement," and "makes a mockery of the requirement of Maryland law that a former spouse is entitled to a share of the 'marital property' portion of a participant's retirement benefits." Addressing her bid for a share of Mr. Fultz's disability benefits, Ms. Shaffer began by looking to the "when" in the "if, as and when" language of the Separation Agreement in stating that the parties agreed that she would share in Mr. Fultz's benefits *when* he received them; since he began receiving benefits in 1992, she became entitled, under the Separation Agreement to share therein at that time. Drawing upon the Court of Appeals' language in *Lookingbill, supra,* 301 Md. at 288, 483 A.2d 1, she further predicated her claim to her former husband's disability benefits upon the fact that his entitlement to these payments in the first instance arose by virtue of his employment and, therefore, constituted a form of marital property. Ms. Shaffer then attacked the CAO's provision for a ten-year certain and continuous annuity, stating that her share thereof would only be guaranteed for ten years and the length of Mr. Fultz's life thereafter. The only way her benefits would be protected, she argued, would be by an award of the 100% survivor annuity upon which the parties agreed.

The County filed its own memorandum in Ms. Shaffer's appeal to the MSPB. In it, the County stated that the CAO's decision respecting the pension benefits was "fair, rational, and in accordance with the Separation Agreement," and reiterated that ERS regulations did not permit Mr. Fultz to purchase the annuity Ms. Shaffer was demanding. It averred that, in using the phrase, "pension and retirement benefits," in the Separation Agreement, the parties did not "consider[ ] the possibility that [Mr.] Fultz would 'retire' on disability two years after execution of the separation agreement." Rather, the County reasoned, "it appears that the parties intended to divide those benefits payable when [Mr.] Fultz retired in the normal way, after 20 or 25 years' service." The County stated further that the parties had adopted the traditional concept of marital property in their agreement and, because Mr. Fultz's

disability occurred after the divorce, Ms. Shaffer's lack of entitlement thereto was without question.

The County also rejected Ms. Shaffer's contention that her share of benefits, in accord with the *Bangs* Formula, should be calculated as of the date Mr. Fultz retired, rather than the date of the divorce, stating that, despite her importuning, such a conclusion "is not supported by the facts, the language of the agreement, the *Bangs* decision, or elementary considerations of fairness." It contended that the parties' Separation Agreement was meant to divide the rights, obligations, and property they owned at the time of the divorce and not some later time. In respect to the annuity, the County simply reiterated that Ms. Shaffer's status as a former spouse precluded Mr. Fultz from electing her as a beneficiary of a 100% survivor annuity; the ERS could not be forced to accept such a late designation.

The MSPB rendered its decision on July 25, 1994, affirming the CAO's ruling. In it, the Chairman stated that the CAO was "correct in ... conclu[ding] that the disability benefits which Mr. Fultz received approximately two years after the divorce were outside the contemplation of the separation agreement and, thus, outside the benefits which had already vested during the marriage." He further stated that, despite the Separation Agreement, Ms. Shaffer did not qualify for a survivor annuity under the Montgomery County Code. That is to say, she was not a spouse or child. *See* § 33–44(a)(3). The MSPB concluded that Ms. Shaffer's entitlement to any benefits would mature upon Mr. Fultz's scheduled retirement date, to be calculated by a formula taking into account only "those benefits earned during the marriage and fixed and vested as of the date of the divorce."

### The Consolidated Case

A hearing on all matters was thereafter held in the Circuit Court for Montgomery County on November 23, 1994.[10] Mr.

---

**10.** It is not clear whether Ms. Shaffer filed an appeal from the MSPB's decision.

Fultz argued that the "pension and retirement benefits" contemplated by the Separation Agreement were those that succeeded completion of "ordinary uninterrupted service" of employment. He distinguished disability retirement payments therefrom, based upon the fact that deductions therefor were not taken from his salary as is generally the case with pension benefits. He further stated that payments stemming from a disability that occurs after a divorce should not be exposed to classification as marital property and, thus, Ms. Shaffer should not participate in the distribution of those benefits at any time. Indeed, he contended, if *any* kind of retirement benefit had been intended when the parties executed the agreement, they would have expressly provided therefor.

Ms. Shaffer proffered a converse position, alleging that the parties had indeed intended that "pension and retirement benefits" include disability benefits. She then challenged the finding that, because use of the *Bangs* Formula would transfer to her money Mr. Fultz had earned following the divorce, her benefits should be determined as of the date of the divorce. She stated that this concern had been addressed in *Bangs* and, "although the former spouse does in fact get some of the benefit of the post-divorce earnings, ... it ... is offset by the percentage [resulting from the *Bangs* Formula] going down." Furthermore, she argued, the method of calculation advocated by the County to adjust for this anomaly, *i.e.*, the determination of her benefits as of the time of divorce, was contrary to the Separation Agreement's provision for payment of a percentage of Mr. Fultz's *monthly* benefits, and "freez[es] her share" as of 1990. She went on to claim that, once Maryland law permitted the division of pension benefits between former spouses, a procedure otherwise prohibited under ERS regulations, the requirement that the *Bangs* Formula be used when such a division is effected should be similarly permitted, despite ERS regulations to the contrary. She proffered the same argument against selective application of Maryland law

in respect to the 100% survivor annuity, and made a claim for attorney's fees, citing a provision in the Separation Agreement providing for same in the event of a breach of the agreement.

While the County agreed with Mr. Fultz that the Separation Agreement had not contemplated division of any disability retirement benefits but, rather, encompassed benefits arising solely out of a "customary type of retirement," it stated that Ms. Shaffer did have a right to receive retirement benefits, a right that would have matured in 1997 or 2002 when, under the Separation Agreement, Mr. Fultz was scheduled to "retire[ ], or be eligible for retirement." It then added: It "is . . . rational and very reasonable . . . to apportion the benefits . . . as of the time of the divorce . . . and to fix the benefits that are then going to be paid out and not to take into account future events." In respect to the annuity, the County looked to the terms of the parties' agreement in arguing that they had specifically provided for a remedy in the event that Mr. Fultz, for whatever reason, failed to elect a 100% survivor annuity in her favor. It is to that provision, the County argued, that Ms. Shaffer must look for recourse.

In an opinion rendered from the bench on November 23, 1994, the court stated, in part:

[I]t was obviously the intention of the parties to secure Mrs. Fultz'[s] economic interest that she had in the marital relationship while it existed.

Of course, the Court has a limited number of methods in which he can resolve this dispute, but one of them certainly results in essentially the evaporation of her economic interests. That is totally inconsistent with the separation and property settlement agreement executed between the parties. It is also an inappropriate resolution.

Fortunately, principles of equity do somehow permeate the body of law commonly called family law, and more often than not the Court is really oriented toward reaching a real and practical solution, as opposed to something that is impractical and theoretical.

Essentially I guess, what I am about to do is more in line with reformation than anything else, but obviously the type of retirement contemplated is not the reality of this case. What I am going to do is determine that it is appropriate for the Court to carry out the full intention of the parties.

With respect to the rights under the disability retirement that now applies to Mr. Fultz, essentially I am going to translate the retirement participation as recited by the parties to his disability pension, and the same percentage, and it shall be paid in the same fashion, if, as and when.

The court also denied Ms. Shaffer's claim for attorney's fees, finding that Mr. Fultz had a "good faith basis for challenging the position[s] of the competing parties," and had not acted "willful[ly]" in failing to comply with the Separation Agreement. The court provided a more detailed ruling in its written Order of January 9, 1995. Specifically, it also found Ms. Shaffer to be entitled to the 100% survivor annuity, in addition to the interest in Mr. Fultz's retirement benefits, including those received on account of disability. The court further ordered that Mr. Fultz pay Ms. Shaffer an amount equal to her share of disability benefits received through November 30, 1994, totalling approximately $44,000.

Mr. Fultz, on January 17, 1995, filed a Motion to Alter or Amend Judgment, asserting that "the Court's January [9], 1995 Order effects a division of non-marital property which is not permitted by the Maryland Marital Property Act and its decisional law." He stated that the intent of the parties "clearly *excluded* the possibility that [Ms. Shaffer] would receive the windfall benefit which the Court ... authorized," and "that the ... contractual language [was] clear and unambiguous and permit[ted] only the conclusion that pension benefits earned DURING THE MARRIAGE ... were to be divided equally between the parties 'if, as, and when' Mr. Fultz reached the specified age(s) and [Ms. Shaffer] chose when to receive her share." He hinged this argument against permitting Ms. Shaffer to share in his disability payments upon the absence of language in the Separation Agreement that provided for the "speculative possibility" of disability and

the fact that no amounts were deducted from his salary to fund same. He again likened his disability payments to those resulting from personal injury or workers' compensation claims and stated, "[I]t is virtually impossible to conclude that either of the parties intended that a post-divorce disability retirement would be subject to equitable division by the Court." He claimed that, by its Order, the court had, effectively, rewritten the parties' Separation Agreement to provide Ms. Shaffer with a share of benefits for which she had never bargained, whose source was "unmistakably non-marital funds." He requested, *inter alia,* that the court vacate its Order and hold a hearing to ascertain the parties' intent when executing the Separation Agreement. Both the County and Ms. Shaffer filed motions in response, which restated their respective positions on the issues.

The circuit court denied Mr. Fultz's motion, following a hearing on May 16, 1995. Mr. Fultz filed the instant appeal from that denial, as well as from the court's January 9, 1995 Order. The County filed its own notice of appeal in the matter.

## THE LAW

### I.

### The Disability Retirement Benefits

"Marital property" is merely a term created to describe a status of property acquired during marriage, which, however titled, may give rise to potential inequity upon dissolution of marriage. It is this inequity that is corrected by way of a monetary award. *See* Md.Code (1984, 1991 Repl.Vol., 1995 Supp.), § 8–205 of the Family Law Article (FL). Couples seeking to avoid the vagaries attendant upon such an award often enter into agreements whereby these property issues, as well as matters of alimony and child support, are resolved. The right to make these agreements, sometimes termed property settlement agreements, is without question. *Schneider v. Schneider,* 335 Md. 500, 516, 644 A.2d 510 (1994);

*Grossman v. Grossman,* 234 Md. 139, 145, 198 A.2d 260 (1964); FL § 8–101. Indeed, FL § 8–105 provides the court with power to enforce the provisions of a settlement agreement; an agreement that has been incorporated, but not merged, into the final decree, may be enforced as a judgment or as an independent contract. FL § 8–105(a)(2). In the latter instance, a settlement agreement is subject to general contract law; *Feick v. Thrutchley,* 322 Md. 111, 114, 586 A.2d 3 (1991) (quoting *Goldberg v. Goldberg,* 290 Md. 204, 212, 428 A.2d 469 (1981)); *Hale v. Hale,* 66 Md.App. 228, 231, 503 A.2d 271 (1986); *Blum v. Blum,* 59 Md.App. 584, 593, 477 A.2d 289 (1984); *see also Pumphrey v. Pumphrey,* 11 Md.App. 287, 290, 273 A.2d 637 (1971). Particular questions must be resolved by looking first to the particular language of the agreement at issue. *Id.* If that language is clear as to its meaning, there is no room for construction and it must be presumed that the parties meant what they expressed. *Feick, supra,* 322 Md. at 114, 586 A.2d 3; *General Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306 (1985); *Bernstein v. Kapneck,* 46 Md.App. 231, 244, 417 A.2d 456, *aff'd,* 290 Md. 452, 430 A.2d 602 (1980); *Saggese v. Saggese,* 15 Md.App. 378, 388, 290 A.2d 794 (1972); *see also* John F. Fader, II & Richard J. Gilbert, *Maryland Family Law* § 16.1 (1990). The court may not rewrite the terms of the contract or draw a new one when the terms of the disputed contract are clear and unambiguous, merely to avoid hardship or because one party has become dissatisfied with its provisions. *See Canaras,* 272 Md. at 350, 322 A.2d 866; *Automatic Retailers of Am., Inc. v. Evans Cigarette Serv. Co.,* 269 Md. 101, 108, 304 A.2d 581 (1973); *Kasten,* 268 Md. at 329, 301 A.2d 12; *Metropolitan Life Ins. Co. v. Promenade Towers Mut. Hous. Corp.,* 84 Md.App. 702, 718, 581 A.2d 846, *aff'd,* 324 Md. 588, 597 A.2d 1377 (1990); *Stueber v. Arrowhead Farm Estates Ltd. Partnership,* 69 Md.App. 775, 780, 519 A.2d 816, *cert. denied,* 309 Md. 521, 525 A.2d 636 (1987). If, however, a reasonably prudent person would consider the contract susceptible to more than one reasonable interpretation, it will be deemed ambiguous. *State v. Attman/Glazer P.B. Co.,* 323 Md. 592, 605, 594 A.2d 138

(1991); *Truck Ins. Exch. v. Marks Rentals, Inc.*, 288 Md. 428, 433, 418 A.2d 1187 (1980); *Promenade Towers,* 84 Md.App. at 717, 581 A.2d 846; *Board of Educ. v. Plymouth Rubber Co.*, 82 Md.App. 9, 26–27, 569 A.2d 1288, *cert. denied,* 320 Md. 505, 578 A.2d 778 (1990). In that case, the parties to a written contract will not be allowed to place their own interpretation on what it means or was intended to mean; the test is what a reasonable person in the position of the parties would have thought that it meant. *Satine v. Koier,* 223 Md. 417, 420, 164 A.2d 913 (1960); *Bernstein,* 46 Md.App. at 245, 417 A.2d 456. A contract is not ambiguous merely because the parties thereto cannot agree as to its proper interpretation.

█ Turning to the case *sub judice,* the parties agreed: "[I]f, as and when the husband retires, *or is eligible for retirement,* the wife shall receive ... one-half of the monthly pension and retirement benefits, specifically including all Cost of Living Adjustments (COLAS) thereon, earned during the marriage, to be calculated" according to the *Bangs* Formula. (Emphasis added.) Before we may address the issues raised, we must first determine the scope of the benefits upon which the parties agreed. If the phrase, "pension and retirement benefits," includes those benefits paid on account of disability, Ms. Shaffer was entitled to participate in their disbursement, if, as and when received, *i.e.,* as of February, 1992. Conversely, if the parties intended that "pension and retirement benefits" only encompass those paid following a lengthy period of service, Ms. Shaffer was not entitled to any benefits received by her former husband until such time as he would have been permitted, under § 33–43(i)(1), to elect to continue receiving disability payments or to receive accrued vested retirement benefits in lieu thereof. In order to ascribe a more precise description to the benefits, we look to several other cases that have addressed the issue.[11]

---

11. In so doing, we do not address those cases that involve retirement plans administered under the Employee Retirement Security Act (ERISA), 29 U.S.C. § 1001 *et seq.,* which "expressly preempts state law

Pension benefits were first considered marital property, to the extent accumulated during marriage, in *Deering v. Deering*, 292 Md. 115, 128, 437 A.2d 883 (1981). Pension benefits were seen "as an economic resource acquired with the fruits of the wage earner spouse's labors which would otherwise have been utilized by the parties during the marriage to purchase other deferred income assets." *Id.* at 124, 437 A.2d 883. While the *Deering* Court recognized that there existed a "wide variety" of retirement plans, both public and private, contributory and noncontributory, with different vesting rules, it stated that

> [t]he dominant trend in this area of the law, however, rejects such distinctions between pension benefits when making the threshold determination of whether a retirement plan constitutes marital property and postpones consideration of the possibly contingent nature of such rights until valuing the asset or apportioning the marital property between the parties.

*Id.* at 126–27, 437 A.2d 883 (discussing *Weir v. Weir*, 173 N.J.Super. 130, 413 A.2d 638 (Ch. Div.1980); *In re Marriage of Brown*, 15 Cal.3d 838, 126 Cal.Rptr. 633, 544 P.2d 561 (1976) (*en banc*)). *Deering* involved service-related retirement plans.

In *Lookingbill v. Lookingbill, supra*, 301 Md. 283, 483 A.2d 1, the Court of Appeals was asked to determine whether a disability retirement plan fell within the holding in *Deering*. There, the Carroll County Fire Department provided the husband with several pension plans, each available to him under certain circumstances, and two of which had importance to the case. The first, a service retirement plan, was administered according to the employee's age and length of service. The second, an accidental injury retirement plan, permitted "a fireman ... [to] receive an allowance regardless of age or length of service," *id.* at 284, 483 A.2d 1; the dominant factor was a work-related injury. Shortly before the parties were divorced, the husband retired by reason of a work-related

---

and comprehensively regulates all aspects of private pension plans." *Deering v. Deering*, 292 Md. 115, 125–26 n. 8, 437 A.2d 883 (1981).

injury and began receiving an allowance therefor. In making a monetary award to the wife, the trial court determined that the husband's pension benefits were marital property and, accordingly, ascribed a value thereto for purposes of the award. In its opinion, the Court of Appeals acknowledged that " 'pension benefits have become an increasingly important part of an employee's compensation package which he or she brings to a marriage unit.... [T]he pension right ... may well represent the most valuable asset accumulated by either of the marriage partners.' " *Id.* at 287, 483 A.2d 1 (quoting *Deering*, 292 Md. at 122–23, 437 A.2d 883). Echoing its language in *Deering*, the Court found inapposite the fact that the husband began receiving the disability benefits before his divorce; "neither the fact of vesting nor the fact of maturing is significant to a determination whether a pension is marital property." *Id.* at 288, 483 A.2d 1. Indeed, "the contingencies to which the payment of [an] allowance may be subject are [also] not significant to a determination whether the pension is marital property." *Id.* at 289, 483 A.2d 1. Viewed in this light, "[p]ension payments are actually partial consideration for past employment whether the maturity of the pension is contingent upon age and service or upon disability." *Id.; see also Prince George's County Police Pension Plan v. Burke,* 321 Md. 699, 705, 584 A.2d 702 (1991). While "*Deering* did not speak directly to disability plans," the Court stated, "its rationale and authorities fully support the conclusion that a disability plan, in appropriate circumstances,[12] may constitute marital property." 301 Md. at 289, 483 A.2d 1.

One such set of circumstances was presented in our recent case of *Lebac v. Lebac,* 109 Md.App. 396, 675 A.2d 131 (1996). There, in connection with their divorce, the parties had executed a separation agreement, which stated, in part:

---

12. The County remained appellant's employer throughout the pertinent period of time. Accordingly, we do not here address a situation in which the employer, at the time of an employee's disablement, is different from the employer during the marriage. The resolution of that situation will have to await an appropriate case.

[W]hen and if the [husband] shall be entitled to receive retirement benefits from his U.S. Secret Service employment, the [wife], as alternative payee, as and for marital property, shall receive a sum equal to twenty percent (20%) of any payment received by [the husband] as a result of his employment by the U.S. Secret Service Uniformed Division. . . .

109 Md.App. at 399–400, 675 A.2d 131. Thereafter, the husband retired on disability and began receiving monthly payments therefor; the wife received no share of those benefits. Relying upon the agreement, she sought the entry of judgment for her share thereof. In defense, the husband maintained that his disability benefits were in the nature of workers' compensation and, because received following the divorce, were not subject to equitable distribution.

We held that the husband's disability retirement income was a retirement benefit covered by the parties' separation agreement. Although the pension plan under which the husband had retired was a noncontributory one, *i.e.*, it was funded solely by his employer, *id.* at 406, 675 A.2d 131, we reiterated our observation in *Ohm v. Ohm*, 49 Md.App. 392, 397, 431 A.2d 1371 (1981) (quoting *In re Marriage of Rogers*, 45 Or.App. 885, 609 P.2d 877, 880, *modified*, 47 Or.App. 963, 615 P.2d 412 (1980)), that, " '[e]ven where contributions have been made entirely by the employer, the courts have concluded that retirement benefits are a mode of employee compensation and as such are an earned property right of the marriage.' " We then noted that, although the husband's participation in the pension plan was contingent upon his retirement on disability, contingent interests have long been recognized as property in Maryland. 109 Md.App. at 406, 675 A.2d 131 (citing *Lookingbill, supra,* 301 Md. at 289, 483 A.2d 1). Because "his disability retirement rights were acquired during his marriage," *id.* at 407, 675 A.2d 131, the fact that he was actually disabled after the marriage did not bar the wife from sharing therein. Worthy of particular note is our *dictum* in *Lebac:* "[W]e think that no matter how [the husband]'s retirement benefits are characterized, [the wife] is entitled to twenty per

cent of them. . . . [W]hen the parties [executed their agreement], . . . they were agreeing that no matter how characterized, [the husband]'s retirement benefits are 'marital property,' entitling [the wife] to twenty per cent of them." *Id.* n. 11 (bracketed material added).

The parties in the case *sub judice* agreed that Mr. Fultz's pension and retirement benefits were marital property. We are, thus, guided by that recital and need only determine whether the trial court properly found that Mr. Fultz's disability payments were a retirement benefit within the scope of their agreement.

The cases we have discussed indicate that disability benefits are in fact a type of retirement benefit subject to equitable distribution, whether the pensioner is disabled before or after the parties' divorce. Because the parties to the instant matter agreed that Mr. Fultz's retirement benefits constitute marital property that was to be divided upon receipt, the validity of Ms. Shaffer's claim to his disability benefits is pellucid. Moreover, by their agreement, the parties contractually fixed their rights and obligations attendant to the divorce, and Mr. Fultz may not now challenge its terms merely because he is dissatisfied with its effects and/or his failure to define more precisely those benefits in which Ms. Shaffer would share. The parties placed their own definition upon the anticipated benefits, and they must abide by that definition. However the payments are characterized, the parties' Separation Agreement provided that Ms. Shaffer share in any and all allowances paid to Mr. Fultz on account of his retirement. The trial court did not err in finding Ms. Shaffer was entitled to participate in the disbursement of those benefits. We explain further.

Throughout the pendency of this matter, Mr. Fultz argued that, as long as he was receiving a disability allowance, he was not "retired" and Ms. Shaffer was not entitled to participate in any disbursement of benefits. Not only does this position ignore the clear language of the Montgomery County Code, but we also cannot agree that the parties intended that Ms. Shaffer would be completely disenfranchised in the event that

Mr. Fultz's retirement arose from anything other than a lengthy period of service. Had that been the case, the parties would have included language in the Separation Agreement duly restricting Ms. Shaffer's right to benefits rendered solely on account of an extended period of service. Moreover, the absence of language specifically excluding disability benefits from the phrase, "pension and retirement benefits," demonstrates that the parties intended any type of pension and retirement benefit to apply. The contractual language was all-inclusive. By its clear terms, it included any and all pension rights and retirement rights. Therefore, although Mr. Fultz's right to receive disability payments was contingent upon his retirement on disability, it was still a right that, at least partially, accrued during the marriage by virtue of Mr. Fultz's employment in the first instance, and Ms. Shaffer was entitled to share therein.

We note further that Mr. Fultz labored under a fundamental misconception about the import of the ERS regulations. Section 33–43(i)(1) provides that, upon attainment of a member's scheduled retirement date, a member who is receiving a disability pension is required to make an election in favor of continuation of those benefits in lieu of accrued vested benefits, or in favor of commencing receipt of vested benefits and terminating disability benefits. In either instance, the member may only receive one pension. Therefore, to the extent that Mr. Fultz stated that Ms. Shaffer could not share in *any* of his disability benefits, he was mistaken. Had he not died and were he to have elected to continue receipt of disability payments, Ms. Shaffer would then necessarily have been entitled to receive a share of those benefits, under the terms of the Separation Agreement. Mr. Fultz could not have unilaterally deprived his former wife of her share of his retirement benefits merely by placing his own characterization upon his disability allowances in order to avoid compliance with their agreement. *See Lebac, supra,* 109 Md.App. at 407, 675 A.2d 131 (The husband's "perception that the separation agreement provided otherwise is of no consequence.... Were we to adopt [his] position, his election of a disability

retirement rather than a normal 'service' retirement would leave [the wife] without recourse. We do not believe that such a result was intended.").

Mr. Fultz also looked to correspondence transmitted between counsel during finalization of the terms of the Separation Agreement to support his claim that disability benefits were not intended to be within the scope of "retirement benefits." Be that as it may, the parties' final agreement made no such distinction, and we shall not ascribe such an interpretation to it. They agreed that pension and retirement benefits were marital property that would be divided upon receipt. The trial court did not err in so finding. Mr. Fultz's reliance upon the timing of the receipt of his disability pension in opposing Ms. Shaffer's claim thereto was similarly misplaced. He stated that "property acquired *after* the divorce is non-marital property." While he was correct in so stating, he overlooked the fact that he agreed otherwise—he agreed that his pension and retirement benefits were, in fact, marital property. Moreover, to require a disability benefit to mature before divorce for it to be subject to equitable distribution ignores the fact that contingent rights, *i.e.*, the possibility of receiving disability benefits, are a property right in Maryland. On this point, we are persuaded by Ms. Shaffer's argument that "[t]he fact that the right to receive the disability benefits matured following the divorce no more defeats [her] right to her share of the disability benefits than does the fact that Mr. Fultz'[s] right to receive normal retirement benefits would have also matured following the divorce."

In making our decision, we emphasize that it is based upon the parties' agreement. As we have indicated, FL § 8–105 provides the court with the power to enforce that agreement. Actions in derogation thereof shall be considered a breach of the terms of the agreement. In *Dexter v. Dexter*, 105 Md. App. 678, 661 A.2d 171 (1995), we were presented with a similar set of facts. There, we addressed the husband's breach of a settlement agreement, which provided the wife with a specified percentage of her former husband's military pension "as, if, and when" paid to him. 105 Md.App. at 679,

661 A.2d 171. When the husband retired (after the divorce), both he and his former wife began receiving their respective share of the retirement benefits. Shortly thereafter, the husband voluntarily waived his right to receive those benefits, thereby terminating their disbursement, in order to qualify for greater benefits, based upon disability. By his waiver, however, he had terminated the wife's benefits; she did not receive any share of the disability benefits, based upon a federal statute prohibiting the division thereof to benefit a former spouse. The wife thereafter requested that the trial court reduce to judgment its monetary award based upon the husband's pension and order him to pay her sums in the future based upon the percentage upon which they had agreed.

The trial court, recognizing that the wife was "[b]asically ... seeking to enforce the agreement," *id.* at 682, 661 A.2d 171, stated, in part:

What I do see, though, is parties ... entering into an agreement in which both of them contemplated ... the husband would retire ... and the wife would receive 47.5 percent of his retirement pay ... and that is what they bargained for, and that is what they intended ... I find as a matter of fact that that is what the parties intended.

... I think implicit in an agreement is that both parties will take any and all reasonable steps to carry out the intentions of the parties as expressed by this agreement.

. . . .

... I am sure that it isn't fair. . . . It has the clear effect of depriving the ... wife of a substantial portion of the benefits of this agreement. . . .

... [I]f a reasonable interpretation can be given ... then that interpretation should be given ... although the husband had an absolute right to pursue [disability] benefits ..., he couldn't do that and at the same time deprive the wife of the benefits that she had bargained for under the agreement.

So what I find is that ... the implicit terms of the agreement would require the husband to make the wife

whole, and by doing that he would have to pay her the amount that they bargained for in order to not be in breach of the agreement, and he hasn't done that, and so I find that he has breached the agreement. . . .

*Id.* at 683–84, 661 A.2d 171 (footnote and emphasis omitted; some brackets and omissions in original).

In affirming the trial court's judgment, we stated that, under the statute, the wife was not entitled to share in the greater disability benefits, but was entitled to receive that which she would have received under the agreement had the husband not waived his right to the military pension. It is particularly cogent that the agreement specifically referred to the division of the husband's "military pension" and no other. It is because the husband had hindered his former wife's right to receive his *military pension* that we considered him to have breached the agreement and held that,

under Maryland contract law where . . . the parties enter into an agreement that one spouse will receive a percentage of [specific] pension benefits, on a periodic basis, when they become payable, and when . . . they are already payable and being paid, the pensioned party may not hinder the ability of the party's spouse to receive the payments she has bargained for.

*Id.* at 686, 661 A.2d 171.

Mr. Fultz claimed that the trial court "ran afoul" of our holding in *Dexter* and asked us to direct the court to award Ms. Shaffer that for which she bargained, *i.e.*, that amount of vested accrued pension that accumulated during the marriage. Ms. Shaffer finds *Dexter* inapposite. We are inclined to agree with Ms. Shaffer.

Although, in effect, Ms. Shaffer is seeking to enforce the agreement, it is an agreement that specifically provides for a division of *all* retirement benefits, benefits that we have held include disability benefits, unless they are expressly excluded. As we have indicated, the agreement in *Dexter* specifically provided the wife with a share in her husband's "military pension," to the apparent exclusion of all others. She had not

contracted for a right in any other pension plan, or in all pension plans available to her former husband. Moreover, in *Dexter*, there were two separate and distinct pensions at issue—the military pension and a pension administered by the Veterans' Administration. In the case *sub judice*, Mr. Fultz's benefits, service or disability related, emanated from one source—the ERS. He did not need to reapply to another agency or pension plan to continue receiving benefits. The ERS "constitute[d] the only source of [Mr. Fultz]'s retirement income. Therefore, he [was] receiving 'retirement benefits' as a 'result of his employment ...' [as provided for in the agreement]. Consequently, [Ms. Shaffer]'s right to receive [a part] of [his] retirement benefits vested the moment he retired." *See Lebac, supra,* 109 Md.App. at 407, 675 A.2d 131 (footnote omitted).

We hold, therefore, that the court properly enforced the agreement to provide Ms. Shaffer with a share in the disability benefits. The court also properly calculated the amount of the award. Accordingly, we shall therefore affirm that part of the trial court's January 9, 1995 Order.

## II.

### The 100% Joint and Survivor Annuity

■ The County appeals from that portion of the trial court's ruling that ordered Mr. Fultz to elect a 100% joint and survivor annuity in favor of Ms. Shaffer. Because of Mr. Fultz's untimely death, this issue may be of significance in the distribution of his estate. If the trial court erred in ordering that the election in Ms. Shaffer's favor be made, Mr. Fultz's designation of his widow and two children stands. Otherwise, Ms. Shaffer receives the amount of the survivor benefits to the exclusion of Mrs. Fultz.

The County maintains that Ms. Shaffer is not now, and has not been since February 21, 1990, eligible for designation as a joint and survivor beneficiary. Section 33–44 provides for elections in favor of spouses and children, see § 33–44(a)(3), but not former spouses, the County claims. Ms. Shaffer

argues that "[t]he County's position is inconsistent and not supported by any reasonable interpretation of applicable law." She states that, despite a provision in the ERS regulations prohibiting payment to a former spouse of a share of an employee-member's retirement benefits, such payments are made. By the same token, she continues, the ERS should permit election of annuities and payment thereof to former spouses.

It has been said that "the right to a survivor annuity is incident to the marital relationship, and . . . such a right, analogous to the right to the pension benefits themselves, falls within the definition of marital property contained in *Deering v. Deering, supra,* 292 Md. at 125, 437 A.2d 883." *Pleasant v. Pleasant,* 97 Md.App. 711, 725, 632 A.2d 202 (1993). We went on to state in *Pleasant* that the decision to award a survivor annuity to a former spouse lies within the discretion of the trial court. *Id.* That case, however, involved a judicial award of retirement benefits, rather than an award pursuant to a settlement agreement. FL § 8–105 provides the court with the power to enforce a settlement agreement as an independent contract. Therefore, whatever the validity of Ms. Shaffer's argument in this respect, whenever the parties define the limits of their rights and obligations in a contract, the contract controls, and no discretion is lodged in the court to weigh and apply the equities in conflict with such an agreement. *Hospital for the Women of Maryland ex rel. Robert S. Green, Inc. v. United States Fidelity & Guar. Co.,* 177 Md. 615, 623, 11 A.2d 457 (1940).

Under the terms of the Separation Agreement, the parties provided a remedy in the event that Mr. Fultz failed to make the designation. They agreed that "his estate shall be liable to the wife for the full amount of [Mr. Fultz]'s death benefits to which she would be entitled." Ms. Shaffer may not use the Separation Agreement as a sword to obtain a share of Mr. Fultz's disability benefits and as a shield to avoid application of the remedy upon which the parties agreed. As was the case with Mr. Fultz, Ms. Shaffer's dissatisfaction with her contractual decision to accept the alternate remedy is not a

basis upon which to ignore it. The trial court erred in failing to rule that Ms. Shaffer's only recourse lay with the Separation Agreement. Moreover, with Mr. Fultz's death, he cannot be ordered to do anything. Events have curtailed the ability of the court to impose orders on Mr. Fultz. Of necessity, Ms. Shaffer must look to the Separation Agreement for relief, if any.

We caution that our holding is limited to circumstances in which an agreement establishing the parties' rights and obligations attendant to their divorce has been executed. We make no comment upon the effect of a noncontract-based judicial award to an individual of his or her former spouse's retirement benefits.

**JUDGMENT AS TO DISABILITY BENEFITS AFFIRMED; JUDGMENT AS TO ANNUITY REVERSED; COSTS TO BE PAID ONE–HALF BY APPELLANT FULTZ AND ONE–HALF BY APPELLEE.**